[No. C042184. Third Dist. Dec. 6, 2004.]

TESCO CONTROLS, INC., Plaintiff, Cross-defendant and Respondent, v. MONTEREY MECHANICAL COMPANY, Defendant, Cross-complainant and Appellant;
FIREMAN'S FUND INSURANCE COMPANY et al., Defendants and Appellants.

COUNSEL

McInerney & Dillon and Timothy L. McInerney for Defendants, Cross-complainant and Appellants.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, C. Athena Roussos; The Office of Michael L. Gums and Michael L. Gums for Plaintiff, Cross-defendant and Respondent.

OPINION

NICHOLSON, J.—Plaintiff sought to recover money owed it on a contract under which it supplied electrical equipment for a public works project. Defendants claimed plaintiff was barred from recovering because it had waived its mechanic's lien rights up through a date when the funds should have been paid. By grant of summary adjudication, the trial court determined plaintiff's conditional waiver and release of its mechanic's lien rights under Civil Code section 3262, subdivision (d)(1), released lien rights only to the extent plaintiff had received payment and not up through the date stated on the release.

At trial on plaintiff's remaining causes of action, the court granted judgment in favor of plaintiff on its claim for breach of a joint check agreement and also awarded statutory penalties. The trial court also dismissed a cross-complaint filed by defendants.

Except to reverse and remand the award of statutory penalties, we affirm the judgment in all respects, but do so on different grounds than those relied upon by the trial court.

### UNDISPUTED FACTS AT SUMMARY ADJUDICATION MOTION

In February 1998, defendant City of Chico (the City) contracted with defendant Monterey Mechanical Company, Inc. (Monterey), to expand the City's wastewater treatment control plant at a cost of approximately $29 million. The agreement called for the City to pay Monterey by means of progress payments and a final payment. The City agreed not to retain any amounts from the progress payments because Monterey agreed to file a performance bond in lieu of agreeing to retentions.

The City's contract also required Monterey to furnish a bond in the amount of the contract price to guarantee payment of all claims filed against the

project for labor and materials. Monterey obtained the labor and materials bond from defendant Fireman's Fund Insurance Company.

In April 1998, Monterey entered into a subcontract agreement with defendant Stratton Electric, Inc. (Stratton), to complete electrical work for the project at a cost of roughly $3.6 million. The subcontract called for Stratton to submit monthly invoices, and for Monterey to make monthly progress payments to Stratton in the amount of 90 percent of the City's estimate of the amount of work done on the project during the month. Monterey would withhold the remaining 10 percent of the amount owed as a retention to be paid upon final completion and acceptance of the work.

Also, Monterey was not required to pay Stratton unless Stratton provided releases executed by everyone who might have mechanic's lien, stop notice or labor and material bond rights against the project arising out of work performed to that date under the subcontract with Stratton. Monterey did not require Stratton to post a labor and materials bond to cover such claims. Instead, the parties agreed Stratton would "use the 'Joint Check' policy."

Finally, the subcontract expressly required Stratton and plaintiff Tesco Controls, Inc. (Tesco), to provide jointly a complete and operable installation of certain electrical work in accordance with Monterey's specifications.

By a purchase order dated February 1998, Stratton retained Tesco to furnish certain electrical instruments and controls for the project at a cost of roughly $800,000. Subsequent change orders increased the cost to $847,558.

In the purchase order, Stratton agreed to pay Tesco in monthly progress payments equal to 90 percent "of labor and materials which have been *placed in position*, with funds received by [Stratton] from [City] for work performed by [Tesco] as reflected in [Stratton's] applications for payment." (Capitalization omitted, italics added.) The purchase order also awarded attorney fees to the prevailing party in a dispute arising under its terms.

In March 1998, Monterey and Stratton entered into a joint check agreement for the express benefit of Tesco by which Monterey and Stratton agreed to a method for paying Tesco different from that established in the purchase order. According to the joint check agreement, any Tesco invoice sent to Stratton would be copied to Monterey. Monterey would pay Tesco by negotiable check "in the amount of *such invoice*" and made payable to both Tesco and Stratton. (Italics added.) Stratton then would endorse the check and make it payable to Tesco "as payment in full of the related invoice." Payments would be made when normal progress payments were due. The joint check agreement said nothing about retentions.

Defendants admit Tesco fully performed its obligations under the purchase order. However, after the project was completed, Tesco remained underpaid by $194,762. Defendants claim Tesco released its lien rights to recover that amount by a release dated March 15, 1999—an assertion which Tesco denies. The disagreement arose as follows:

Tesco began shipping equipment to the project site in November 1998. Its first invoice, dated November 10, 1998, was in the amount of $14,980. Contrary to the terms of the joint check agreement, Stratton paid this invoice in full by its own check dated January 8, 1999. However, by that time, Tesco had invoiced additional shipments. As of January 31, 1999, $244,762.13, billed on invoices from December 1998 through January 1999, remained unpaid.

Tesco continued shipping equipment in February 1999, but received no payments that month. By March 11, 1999, Tesco's invoicing of equipment resulted in a balance owed of $468,946.13. On March 12, 1999, Tesco received a check drawn directly by Stratton in the amount of $194,762.13, but Stratton asked Tesco not to deposit the check for as long as 30 days. The check never cleared the bank.

Meanwhile, on March 15, 1999, Tesco gave Monterey a lien waiver and release conditioned upon receiving a progress payment of $50,000. The release, made under Civil Code section 3262, subdivision (d)(1), "cover[ed] a progress payment for labor, services, equipment or material furnished to Stratton Electric through 01/31/99 only."[1,2]

By joint check dated March 16, 1999, Monterey paid $50,000 to Stratton and Tesco, which Tesco deposited in its bank. Had Stratton's check for $194,762.13 cleared the bank, it, along with Monterey's $50,000 payment, would have brought Tesco's account current through January 31, 1999 (assuming no retentions were withheld by defendants), and left an outstanding balance of $224,184 owed Tesco for materials and services invoiced as of March 31, 1999. Instead, without that check clearing, unpaid invoices since

---

[1] It was later determined by the trial court after trial that Tesco had issued a conditional lien waiver and release on March 10, 1999, for $50,000, which noted: "This release does not cover retentions of $194,762.13 for items furnished before the release date for which payment has not been received." (Capitalization omitted.) Monterey rejected this release, claiming it did not conform to Civil Code section 3262, subdivision (d). The March 15 release did not contain this notation.

The trial court also determined the $50,000 figure for the release was set by Stratton as the value of material supplied by Tesco that had actually been incorporated into the project. It did not reflect the additional materials that had been delivered to the site but had not yet been installed.

[2] All undesignated section references are to the Civil Code.

December 1998 through March 31, 1999, totaled $418,946.13. If a 10-percent retention was assumed on all of what Tesco had invoiced up to March 31, 1999, Tesco as of that date was owed $370,553.52.

During April and May, there were communications between Tesco, Stratton and Monterey regarding the failure of Stratton's $194,762.13 check to clear the bank and Stratton's inability to bring its accounts payable current. By letter dated May 3, 1999, Tesco informed Stratton it had to be paid $370,553.52 for materials furnished through March 31, 1999. Tesco warned Stratton it would file a stop notice on the project if this amount were not paid in full by May 21. Ultimately, Monterey's division manager, James Troup, learned Tesco was owed approximately $370,000 through March 31 and was threatening not to ship any more product until it was paid.

After further discussions, Tesco issued a second conditional lien waiver and release form, this one dated May 11, 1999, whereby it agreed to release its mechanic's lien rights upon payment from Monterey of $370,553.52. The release covered equipment and services rendered through March 31, 1999.

On May 13, 1999, Troup acknowledged the May 11 release and agreed with Wallace Tessmer, president of Tesco, that Monterey would pay Tesco $200,000 immediately and approximately $170,000 the first week of June. Troup memorialized the agreement in a handwritten notation as follows: "5/13/99 Agreed w/Wally at Tesco Pay $200,000 joint check now and [plus or minus] 170 balance *from 3/31 Release* the first week of June 99." (Italics added.) Of significance here, Troup acknowledged in his deposition Tesco was not owed that much money for the current progress payment, so they agreed to spread the amount over two payments.

By joint check dated May 13, 1999, Monterey paid Stratton and Tesco $200,000. It issued another joint check on June 7, 1999, payable to Stratton and Tesco in the amount of $173,553.52. Tesco applied these payments to its oldest outstanding balances, including those for which Stratton's bounced check had been designated. Its records thus showed, except for a 10 percent retention, it had been paid in full for all services and materials provided through March 31, 1999.

Tesco continued providing product and services, and completed shipping and invoicing its work by July 1, 1999. As of that date, Tesco was owed $412,024.98, but it received no payment. In September 1999, Monterey received a progress payment from the City, but it made no payment to Tesco. In November 1999, Tesco filed a stop notice with the City, and it initiated this action in February 2000. Stratton filed for chapter 11 bankruptcy

protection shortly thereafter. In June 2001, Monterey paid Tesco $217,262.98, leaving Tesco short $194,762, an amount equal to the amount of Stratton's bounced check.

## PROCEDURAL HISTORY

Tesco's first amended complaint contains eight causes of action. The first four were alleged against Stratton: breach of written contract, open book account, account stated, and goods sold and delivered. Stratton is not a party to this appeal. Consequently, we will not address these four causes of action.

The fifth cause of action, enforcement of a stop notice, was alleged against Stratton, Monterey and the City. The sixth cause of action, recovery under the surety bond, was alleged against Stratton, Monterey and Fireman's Fund. The seventh and eighth causes of action were both alleged against Monterey: breach of the joint check agreement, and a request for statutory penalties under Business and Professions Code sections 7107 and 7108.5, Public Contract Code section 10262.5, and, as later amended, Public Contract Code section 7107 in lieu of Business and Professions Code section 7107.

Monterey filed a cross-complaint, alleging breach of contract and misrepresentation by Tesco and breach of contract and equitable indemnity against Stratton. The cross-complaint also sought comparative indemnity from both Tesco and Stratton.

Tesco moved for summary judgment or, alternatively, summary adjudication, to recover the approximately $194,000. Defendants opposed, claiming the March 15, 1999, mechanic's lien release barred Tesco from recovering for work it provided up through January 31, 1999, including the work for which Stratton's unfunded $194,762.13 check was intended to compensate. Defendants also claimed Monterey's payment of $370,553.52 was not intended to include payment for Stratton's bounced check.[3]

The trial court granted Tesco summary adjudication on its first six causes of action. It ruled the March 15, 1999 lien release waived Tesco's lien rights only up to the amount of the $50,000 actually paid to Tesco and not as to the rest of the money owed, and it was undisputed Tesco had not been paid for the total amount owed.

Trial proceeded without a jury on Tesco's seventh and eighth causes of action and on the cross-complaint. The trial court found in favor of Tesco on

---

[3] Some of the declarations upon which defendants based their opposition to the motion for summary judgment are not included in our record and were not requested by defendants to be included in the record. The only declaration included is one by Troup, where he contradicts his earlier deposition testimony.

its remaining causes of action and against Monterey on its cross-complaint. It issued an amended statement of decision, including findings of fact, on May 24, 2002, and entered judgment in favor of Tesco and against all defendants on July 5, 2002, awarding Tesco $194,762 plus interest, statutory penalties, attorney fees and costs.

Monterey, Fireman's Fund, and the City appeal the court's judgment. They allege the trial court erred by (1) determining on summary adjudication the March 15, 1999, lien release released Tesco's lien rights only to the extent of the $50,000 it received from Monterey and not for all work performed through January 31, 1999 regardless of payment; (2) granting a judgment finding Monterey breached the joint check agreement; (3) awarding an excessive amount of prejudgment interest; (4) awarding statutory penalties; and (5) ruling against Monterey's cross cause of action against Tesco for misrepresentation.

## STANDARD OF REVIEW

■ We decide the question on appeal from summary adjudication under the same method used by the trial court. "Under summary judgment law, any party to an action, whether plaintiff or defendant, 'may move' the court 'for summary judgment' in his favor on a cause of action (i.e., claim) or defense (Code Civ. Proc., § 437c, subd. (a)) a plaintiff 'contend[ing] . . . that there is no defense to the action . . . .' The court must 'grant[]' the 'motion' 'if all the papers submitted show' that 'there is no triable issue as to any material fact' (*id.*, § 437c, subd. (c)) that is, there is no issue requiring a trial as to any fact that is necessary under the pleadings and, ultimately, the law [citations]—and that the 'moving party is entitled to a judgment as a matter of law' (Code Civ. Proc., § 437c, subd. (c))." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Motions for summary adjudication proceed in all procedural respects as a motion for summary judgment. (Code Civ. Proc., § 437c, subd. (f)(2).) On appeal, we review the record of the summary adjudication motion de novo. (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116 [113 Cal.Rptr.2d 90].)

■ We review the other issues resolved at trial under the familiar substantial evidence test. We are bound by the trial court's determinations of fact unless they are unsupported by substantial evidence. We do not reweigh the evidence, and we resolve all conflicts in the evidence in favor of the judgment. (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1127–1129 [61 Cal.Rptr.2d 207].) ■ We independently review questions of law. (*Ibid.*)

### DISCUSSION

### I

*Scope and Effect of Lien Release*

Defendants claim the trial court erred when it concluded the March 15 lien release in the amount of $50,000 released Tesco's lien rights only to that amount. They assert Tesco, by issuing the release, waived all of its bond rights to recover money owed for services rendered through January 31, 1999, despite having not been paid for them. Defendants also claim the March 15 release worked an accord and satisfaction to settle the dispute over Stratton's $194,762.13 bounced check, effectively releasing any claim Tesco had to recover that amount.

■ While we conclude the trial court's interpretation of the lien release was incorrect, we also conclude the lien release did not work an accord and satisfaction and, in fact, had no effect on Tesco's ability to assert its lien rights in this action.

### A. *Background information*

■ "Our state Constitution provides: 'Mechanics, persons furnishing materials, artisans, and laborers of every class, shall have a lien upon the property upon which they have bestowed labor or furnished material for the value of such labor done and material furnished; and the Legislature shall provide, by law, for the speedy and efficient enforcement of such liens.' (Cal. Const., art. XIV, § 3.) As this court has said, 'The mechanic's lien is the only creditors' remedy stemming from constitutional command and our courts "have uniformly classified the mechanics' lien laws as remedial legislation, to be liberally construed for the protection of laborers and materialmen." [Citation.]' [Citation.] '[S]tate policy strongly supports the preservation of laws which give the laborer and materialman security for their claims.' [Citation.]" (*Wm. R. Clarke Corp. v. Safeco Ins. Co.* (1997) 15 Cal.4th 882, 888–889 [64 Cal.Rptr.2d 578, 938 P.2d 372].)

■ By law, any waiver of a subcontractor's mechanic's lien rights is null and void unless the lienholder expressly waives his rights pursuant to a form prescribed by section 3262, subdivision (d).[4] Tesco's March 15, 1999 release

---

[4] "Subdivision (a) of Civil Code section 3262 provides: 'Neither the owner nor original contractor by any term of their contract, or otherwise, shall waive, affect, or impair the claims and liens of other persons whether with or without notice except by their written consent, and any term of the contract to that effect shall be null and void. Any written consent given by any claimant pursuant to this subdivision shall be null, void, and unenforceable unless and until the

was given in the form provided by section 3262, subdivision (d)(1), a conditional waiver effective upon receipt of a progress payment. The March 15 release, in compliance with the statute, read in relevant part as follows:

"Upon receipt by the undersigned of a check from Monterey Mechanical Co. in the sum of $50,000.00 payable to Stratton Electric and Tesco Controls, Inc., and when the check has been properly endorsed and has been paid by the bank upon which it is drawn, this document shall become effective *to release any mechanic's lien, stop notice or bond right the undersigned has* on the job of City of Chico. [¶] . . . [¶]

*"This claim shall be released by the undersigned to the following extent: This release covers a progress payment for labor, services, equipment or material furnished to Stratton Electric through 01/31/99 only.*

"This release does not cover any retentions retained before or after the release date; extras furnished before the release date for which payment has not been received; [or] extras or items furnished after the release date. . . . This release of any mechanic's lien, stop notice or bond right shall not otherwise affect the contract rights, including rights between parties to the contract based upon a recission [*sic*], abandonment or breach of the contract, *or the right of the undersigned to recovery [sic] compensation for furnished labor, services, equipment or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment.* [¶] . . . [¶] Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned." (Capitalization omitted, italics added; see § 3262, subd. (d)(1).) The release was signed by an authorized Tesco representative.

Relying primarily on the first two italicized sections, defendants claim the statutory release waived all lien rights for work provided up through

claimant executes and delivers a waiver and release. Such a waiver and release shall be binding and effective to release the owner, construction lender, and surety on a payment bond from claims and liens only if the waiver and release follows substantially one of the forms set forth in this section and is signed by the claimant or his or her authorized agent, and, in the case of a conditional release, there is evidence of payment to the claimant. Evidence of payment may be by the claimant's endorsement on a single or joint payee check which has been paid by the bank upon which it was drawn or by written acknowledgment of payment given by the claimant.'

"Subdivision (d) of Civil Code section 3262 provides that a waiver and release of mechanic's lien rights 'shall be null, void and unenforceable unless it follows substantially the following forms in the following circumstances: . . . .' The subdivision then lists the text of four lien waivers: (1) a conditional waiver and release upon progress payment; (2) an unconditional waiver and release upon progress payment; (3) a conditional waiver and release upon final payment; and (4) an unconditional waiver and release upon final payment." (*Wm. R. Clarke Corp. v. Safeco Ins. Co., supra,* 15 Cal.4th at p. 889.)

January 31, 1999, and barred Tesco from recovering for the amount of work which was not compensated by the time Tesco issued the release. Tesco, relying primarily on the last italicized section, argues the release is valid only to the extent it received payment, and the release did not waive its lien rights to the approximately $194,000 worth of services rendered during that time period which was not paid. (The trial court agreed with this argument.) Alternatively, Tesco claims if the statutory release did waive its lien rights, it did not foreclose Tesco's ability to exercise lien rights on sums that became due after the release date. We agree with Tesco's alternative argument.

## B. *Analysis*

■ We interpret the statutory release according to the following rules: "We begin with the touchstone of statutory interpretation, namely, the probable intent of the Legislature. To interpret statutory language, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In undertaking this determination, we are mindful of this court's limited role in the process of interpreting enactments from the political branches of our state government. In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law, ' " 'whatever may be thought of the wisdom, expediency, or policy of the act.' " ' [Citations.] . . . [¶] 'Our first step . . . is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]' [Citation.]" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632–633 [59 Cal.Rptr.2d 671, 927 P.2d 1175] (*California Teachers*).)

■ "We cannot presume the Legislature . . . engaged in an idle act or enacted a superfluous statutory provision. [Citation.]" (*California Teachers, supra*, 14 Cal.4th at p. 634.) " 'In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose . . . .' [Citations.]" (*Ibid.*)

■ "Of course, we interpret a statute in context, examining other legislation on the same subject, to determine the Legislature's probable intent. [Citations.]" (*California Teachers, supra*, 14 Cal.4th at p. 642.) The court may also review the statute's legislative history, where "[c]ommittee reports are often useful in determining the Legislature's intent. [Citation.]" (*Id.* at p. 646.)

Under the statutory language of the release, a subcontractor or materialman waives his "mechanic's lien, stop notice or bond right[s]" in exchange for a progress payment for services and materials furnished through the date specified in the release, whether or not he receives compensation for all of

those services and materials. However, the language retains for the same subcontractor a right to recover compensation for services and materials furnished through the date of his release for which he was not compensated. Unable to resolve this apparent conflict definitively from that language, we turn to section 3262's legislative history for insight into the Legislature's intent.

"Mechanics' liens 'relate back' to the time work first commences on a project. (§ 3134.) The relation back feature of mechanics' liens is of particular importance to construction lenders. Lenders who have made loans after the commencement of work on a jobsite have found their loans subordinate to mechanics' liens arising out of work performed or material delivered after trust deeds securing those loans were recorded because some work was performed or materials delivered before recordation. [Citations.] Accordingly, lenders typically require releases of existing lien rights before they will make progress payments on construction loans. [Citation.]

"In 1982, however, the ability of construction lenders to obtain valid releases of liens was undercut by *Bentz Plumbing & Heating v. Favaloro* (1982) 128 Cal.App.3d 145 [180 Cal.Rptr. 223]. *Bentz* construed Civil Code section 3262 to render *all* lien waivers null and void. [Citation.] The decision dried up construction loans and plunged construction lending in California into chaos.

"In response, Assemblyman Bill Lancaster introduced Assembly Bill No. 844 in February 1983, sponsored by the Associated General Contractors and Southern California Contractors Association. The bill amended section 3262 to create four kinds of waiver and release of mechanic's lien rights, and prescribed a form for each one." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1247–1248 [8 Cal.Rptr.2d 298], fns. omitted (*Halbert's Lumber*).)

The scope of a conditional lien release under section 3262, subdivision (d)(1), as that statute then existed, came under review in the 1992 case of *Halbert's Lumber*. In April 1986, a framing company, subcontractor on a project to construct a supermarket, placed an order with a lumber company for two truckloads of "glu lam" beams for use in the project. The beams arrived on May 12 and May 15. On May 20, the subcontractor demanded a release of the lumber company's lien rights through May 19. The lumber company signed a conditional release waiving lien rights upon a progress payment of roughly $24,000 for materials furnished to the subcontractor through May 19.[5] (*Halbert's Lumber, supra*, 6 Cal.App.4th at pp. 1236–1237.)

---

[5] At that time, the conditional release prescribed by section 3262, subdivision (d)(1) read in its entirety: "Upon receipt by the undersigned of a check from ____ in the sum of $___ payable to ____ and when the check has been properly endorsed and has been paid by the bank upon which it

When it signed the release, the lumber company had not yet posted its invoices for the beams. The $24,000 figure represented other shipments made by the lumber company to the subcontractor prior to the order for the beams. The lumber company did not know the beams had been delivered to the site when it signed the release. (*Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1237.)

On June 9, the lumber company posted its invoice for the beams. It received payment for the $24,000, but was never paid the cost of the beams. The general contractor terminated its agreement with the subcontractor, and the latter eventually filed for bankruptcy. The lumber company sought to enforce a mechanic's lien for the cost of the beams, but the trial court ruled the May 20 release barred the lumber company from recovering. (*Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1237.)

A unanimous court affirmed the judgment, concluding the scope of the lien release was determined by the date listed on the release, not by the amount actually paid. The court first determined the language of section 3262, subdivision (d)(1), was too ambiguous and its legislative history too unclear to assist the court in interpreting the statute. It thus interpreted the statute so as to ascribe to it a reasonable and practical meaning it felt would avoid absurdity. It reasoned as follows:

"[L]ien rights are a remedy available to workers and suppliers who have not been fully paid. If the release form prescribed in section 3262, subdivision (d)(1), covered only suppliers who had no claim for *further* payment for materials delivered through the release date, the form would release nothing that otherwise would not be released anyway. A materials supplier could still assert a given payment was not 'for' materials furnished to a customer through the release date, contrary to the recitation of the second sentence of the release form. No potential disputes over whether a given progress payment covered certain work or materials would be resolved, and the parties would remain uncertain of their rights, including the relative priority of any mechanic's lien that might yet be filed. The reading urged by the lumber company would thus render section 3262, subdivision (d)(1), an absurdity. It would make the release nothing more than a glorified receipt. While the intent of the Legislature as to the precise scope of the conditional waiver

is drawn, this document shall become effective to release pro tanto any mechanic's lien, stop notice or bond right the undersigned has on the job of ____ located at ____ to the following extent. This release covers a progress payment for labor, services, equipment or material furnished to ____ through [date] only and does not cover any retention or items furnished after said date. [¶] Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned." (Stats. 1984, ch. 185, § 1, pp. 560–561.)

release set forth in section 3262, subdivision (d)(1) is a bit murky, the general purpose of the statute is reasonably clear. Assembly Bill No. 844 was introduced in the wake of *Bentz* to provide for releases lenders and owners could *rely* on if a certain payment were indeed made. . . .

"If, as in this case, the payment specified in the release could be made and material suppliers were still able to assert mechanics' liens, the release would be 'useless' in paying material suppliers. No rights would be released that would not be released by virtue of the payment *anyway*.

"Moreover, pegging the scope of the release strictly to the extent of payment rather than all work or materials furnished through a certain date is impractical. Lenders would need to physically monitor the progress of the work at the site in order to ascertain whether any given progress payment 'covered' all the work and material which might potentially give rise to mechanic's lien rights. Unless every last piece of lumber were accounted for, lenders would be unable to be certain of the relative priority of their encumbrances—even after they had loaned the money for a progress payment." (*Halbert's Lumber, supra,* 6 Cal.App.4th at pp. 1250–1251, italics in original.)

In 1993, the Legislature introduced two bills in response to *Halbert's Lumber*, Assembly Bill No. 1845 and Senate Bill No. 934. Assembly Bill No. 1845 stated its purpose was to supersede the holding in *Halbert's Lumber*. (Assem. Bill No. 1845 (1993–1994 Reg. Sess.) as introduced Mar. 5, 1993.) If passed, it would have amended the conditional lien release of section 3262, subdivision (d)(1), to state specifically the waiver released any mechanic's lien, stop notice, or bond right "to the extent of the amount of the progress payment" set forth in the release. (Assem. Bill No. 1845, *supra*, § 2.) Assembly Bill No. 1845 was never heard by committee and died. (Cal. Const., art. IV, § 10, subd. (c).)

Senate Bill No. 934 as introduced said nothing about *Halbert's Lumber*, but it, too, if passed, would have amended the conditional lien release form to state specifically the waiver released rights "only to the extent of the payment stated" in the release. (Sen. Bill No. 934 (1993–1994 Reg. Sess.) as introduced Mar. 4, 1993.)

Considering Senate Bill No. 934, the Senate Judiciary Committee acknowledged the bill as introduced would overturn *Halbert's Lumber*. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 934 (1993–1994 Reg. Sess.) as introduced, p. 2.) The Associated General Contractors of California, sponsors of the bill, asserted the case had created a dilemma for the construction industry. Each time a contractor or supplier executed a conditional release for

a progress payment, it would waive all lien and bond rights for all services furnished up to the date of the release, regardless of whether it had been paid. (*Id.*, p. 3.)

Bankers and title companies opposed the language in Senate Bill No. 934, claiming it would place them in the position of never knowing exactly for what they paid when they accepted a release and made a progress payment. They feared a subcontractor could sign a release, and then, at a later date, file a new lien for services that should have been but were not billed at the earlier time. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 934, *supra*, p. 3.)

The Senate Judiciary Committee staff, however, stated the main problem of *Halbert's Lumber* was its effect on retention payments and extra work claims. Claims of this nature are not financially resolved until the project is completed. Under a strict reading of *Halbert's Lumber*, all claims for such services would be waived if the subcontractor provided them prior to the release date. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 934, *supra*, p. 4.)

Regarding the loss of lien rights, staff noted "that even though Halbert's Lumber lost its mechanic's lien rights with regard to the lumber beams, Halbert's could still recover the cost of the beams from [the project owner] in an equity action. It simply would not have the lien to leverage payment of the claim. However, the case went much further than necessary, and its other side-effects would create havoc. . . . [¶] *Yet, the proposed response to the case would appear to transform a release into a receipt for all practical purposes, and could cause great uncertainty for lenders and owners.*" (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 934, *supra*, p. 4, italics added.)

Responding to its staff's concern, the Senate Judiciary Committee amended Senate Bill No. 934. It *omitted* the language limiting the scope of the release to the amount of the payment stated in the release. In its place, it specified certain matters excluded from the release such as retentions and rights based upon a breach of the contract. It also added the following: "This release of any mechanic's lien, stop notice, or bond right shall not otherwise affect the right of the undersigned to recover compensation for furnished labor, services, equipment, or material covered by this release if that furnished labor, services, equipment, or material was not compensated by the progress payment." (Sen. Bill No. 934 (1993–1994 Reg. Sess.) as amended June 7, 1993.) The full Senate unanimously approved the bill as amended and forwarded it to the Assembly. (Sen. Bill No. 934 (1993–1994 Reg. Sess.) approved by Sen. June 10, 1993.)

The Assembly Judiciary Committee staff, explaining the proposed bill, described the Senate's amendment as allowing a subcontractor who executed

a release but was ultimately not paid for services rendered prior to the date of the release to "proceed on general contract law to collect without the existence of mechanic's lien rights." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 934 (1993–1994 Reg. Sess.) as amended June 7, 1993, p. 2.)

Lenders were still concerned with the Senate's amendment, claiming the exemption from the release was too broad. They believed a release that did not waive all rights besides lien rights exposed them to unreasonable risk. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 934, *supra*, p. 5.)

The Assembly Judiciary Committee apparently did not agree with the lenders. Except to clarify the release of lien rights did not otherwise affect the "contract" rights of the subcontractor, it approved the bill as it had been amended in the Senate. (Sen. Bill No. 934 (1993–1994 Reg. Sess.) as amended Aug. 23, 1993.) The full Assembly subsequently approved the bill as amended. (Sen. Bill No. 934 (1993–1994 Reg. Sess.) approved by Assem. Sept. 8, 1993.) The Senate also approved the bill as amended by the Assembly, and the Governor signed the bill into law. (Sen. Bill No. 934 (1993–1994 Reg. Sess.) approved by Sen. Sept. 9, 1993; see Stats. 1993, ch. 1249, § 1, p. 7236.)

The preceding discussion demonstrates the Legislature intended to respond to *Halbert's Lumber*, but the Legislature did *not* intend to change the conditional release under section 3262, subdivision (d)(1), into a glorified receipt. Instead, the Legislature attempted to balance the competing interests. (See *J. A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568 [33 Cal.Rptr.2d 206].) It crafted a release that waived mechanic's lien rights, bond rights, and stop notice rights for services rendered and materials provided up to the date stated on the receipt, even if those services and materials were not compensated by the progress payment. However, waiver was limited only to those express lien rights. By executing the release, the subcontractor or materialman did not waive his rights to pursue compensation for unpaid services and materials under the terms of the contract or as otherwise provided by law or equity. Defendants incorrectly argue the release worked as an accord and satisfaction of the outstanding balance.

We find Tesco, by executing the lien release dated March 15, 1999, waived its mechanic's lien rights, bond rights, and stop notice rights for services rendered and materials supplied up to January 31, 1999. The trial court erred by concluding Tesco's waiver was effective only as to the $50,000 it received in payment. However, this determination does not end our analysis.

Tesco claims it in fact pursued its non-lien remedies to recover the amount of Stratton's bounced check by continuing to negotiate with Monterey and

Stratton and by threatening to stop all further shipments. It argues the undisputed facts show Monterey paid $370,553.52 to bring Tesco current through March 31, 1999, and that amount included payment of Stratton's $194,762.13 bounced check. This action, Tesco argues, is for moneys that were earned and became due after March 31. Thus, the March 15 release is irrelevant to recovering balances that were incurred after March 31. Tesco did not release lien rights for those moneys. On this point, we agree with Tesco.

The undisputed facts presented at the hearing on the summary adjudication motion demonstrate Monterey agreed, except for a 10 percent retention, to make Tesco whole through March 31, 1999, including paying the $194,762.13 Stratton's check had failed to pay. In his deposition, Monterey's division manager, James Troup, stated he understood in early May that Tesco would stop shipments unless they were paid approximately $370,000, which was the total amount unpaid through March 31. Supporting his understanding that amount included the $194,762.13 Stratton failed to pay, Troup acknowledged $370,000 was *more* than what Tesco was due for that particular billing period. Thus, he agreed to pay the $370,000 over two payments. Moreover, the amount Monterey Mechanical paid Tesco matched exactly what was owed through March 31 if a 10 percent retention was taken, as Monterey's contract with Stratton and Stratton's purchase order with Tesco contemplated.[6]

Monterey thus made Tesco current through March 31, 1999, including the amount of Stratton's bounced $194,762.13 check. That Tesco waived its lien rights against that particular money by its March 15, 1999 release has no effect on Tesco's authority to exercise its lien rights on subsequent unpaid balances. By this suit, Tesco is not seeking to enforce its waived lien rights against the $194,762.13 bounced check. Monterey fully discharged that debt. Tesco seeks to recover the approximately $194,000 it undisputedly provided in goods and services after March 31 which Monterey refuses to pay. Nothing in the March 15 release or any other document included in this record prohibits Tesco from exercising its mechanic lien rights to do so. The trial court's judgment in favor of Tesco on its fifth and sixth causes of action is affirmed.

---

[6] Troup submitted a declaration opposing Tesco's motion for summary adjudication, wherein he claimed the $370,553.52 payment was not intended to include payment for goods and services supplied through January 31, 1999. Parties cannot create an issue of material fact by submitting a declaration that contradicts previous statements made under oath. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21 [112 Cal.Rptr. 786, 520 P.2d 10].)

## II

### *Breach of Joint Check Agreement*

In its seventh cause of action, Tesco alleged Monterey breached the joint check agreement by not paying Tesco by means of joint checks made payable to it and Stratton upon presentation of Tesco's invoices. The trial court awarded judgment in favor of Tesco on this cause of action, ordering Monterey to pay Tesco $194,762 plus interest.

Monterey, in a disjointed and brief argument, claims the trial court's decision is incorrect. It argues Tesco breached the agreement first by accepting direct checks from Stratton in January and March 1999. It also claims the court's decision converted the joint check agreement from simply an agreement on the method of payment into an unconditional obligation to pay. The obligation to pay, Monterey argues, was as set forth in the subcontract between Monterey and Stratton, not the joint check agreement. We affirm the trial court's ruling on this issue.

Before Monterey and Stratton executed the joint check agreement, Tesco's right to payment derived from the purchase order agreement between it and Stratton. In that agreement, it was Stratton who agreed to pay Tesco in monthly progress payments based on the amount of materials Tesco had placed in position at the project, subject to a 10 percent retention.

Subsequently, in the joint check agreement, *Monterey* agreed with Stratton, for the express benefit of Tesco, to pay Tesco based on Tesco's invoices and to pay those invoices in full at the same time normal progress payments were due. The trial court determined Tesco had submitted all of its invoices to Stratton and Monterey, and $194,762 in invoiced equipment and services remained unpaid. Substantial evidence supports these determinations.

In fact, Monterey conceded it did not comply with the joint check agreement but paid Stratton only on the basis of percentage completion and the lien releases Stratton obtained from Tesco, not on Tesco's invoices. Monterey disputed ever receiving an invoice from Tesco, but when asked whether it would have made any difference in its method of paying Tesco if Monterey had received copies of Tesco's invoices, Monterey's Troup replied, "No."

Monterey's claim that Tesco breached the joint check agreement first by accepting a direct payment from Stratton is specious. The agreement was expressly between Monterey and Stratton for the benefit of Tesco. Tesco's receipt of money owed it did not void Monterey's continuing obligation to

pay Tesco by joint check in the full amount of each Tesco invoice when normal progress payments were due. Monterey admittedly did not comply with this obligation. Substantial evidence supports the trial court's determination Monterey breached the joint check agreement.

## III

### *Prejudgment Interest*

The trial court awarded Tesco interest from September 1, 1999. It reasoned Tesco's last invoice was dated July 1, 1999, and progress payments on Tesco's outstanding balance would have been due on or about September 1, 1999. Monterey argues the court imposed interest before Tesco was due to be paid under the terms of the purchase order and before there was any breach.

Monterey's argument ignores its obligations under the joint check agreement. This specific agreement altered the terms of payment originally established under the purchase order. It was reasonable for the court to assume a progress payment based on Tesco's last invoice of July 1 would have been made by September 1. The facts show the payment was not made. We will not disturb the court's ruling on this issue.

## IV

### *Statutory Penalties*

Monterey claims the trial court erred when it imposed penalties against it under Business and Professions Code section 7108.5 and Public Contract Code section 7107, Tesco's eighth cause of action. We agree in part.

A. *Background information*

California has a series of so-called "prompt payment" statutes that require general contractors to pay their subcontractors within specified, short time periods, and that impose monetary penalties for violations. Business and Professions Code section 7108.5 and Public Contract Code section 7107 are two of those statutes. Business and Professions Code section 7108.5 requires a general contractor, unless otherwise agreed to by the parties in writing, to pay its subcontractors their respective shares of a progress payment within 10 days of receiving the payment from the project owner. If the general

contractor fails to timely pay, the subcontractor may recover a penalty in the amount of 2 percent of the amount due per month for every month the payment is not made. (Bus. & Prof. Code, § 7108.5.)[7]

 Public Contract Code section 7107 requires a general contractor to pay its subcontractors their respective shares of the retention proceeds within seven days after receiving the proceeds from the public entity that owns the project. (Pub. Contract Code, § 7107, subd. (d).) If the general contractor fails to pay the retention timely, the subcontractor may recover a penalty in the amount of 2 percent of the improperly withheld amount, in lieu of any interest otherwise due. (Pub. Contract Code, § 7107, subd. (f).)[8]

 In the event there is a bona fide dispute over the amount owed, both statutes authorize the general contractor to withhold up to 150 percent of the disputed amount. (Bus. & Prof. Code, § 7108.5; Pub. Contract Code, § 7107, subd. (e).) Both statutes award attorney fees and costs to the prevailing party

---

[7] Business and Professions Code section 7108.5 reads in full: "A prime contractor or subcontractor shall pay to any subcontractor, not later than 10 days of receipt of each progress payment, unless otherwise agreed to in writing, the respective amounts allowed the contractor on account of the work performed by the subcontractors, to the extent of each subcontractor's interest therein. In the event that there is a good faith dispute over all or any portion of the amount due on a progress payment from the prime contractor or subcontractor to a subcontractor, then the prime contractor or subcontractor may withhold no more than 150 percent of the disputed amount.

"Any violation of this section shall constitute a cause for disciplinary action and shall subject the licensee to a penalty, payable to the subcontractor, of 2 percent of the amount due per month for every month that payment is not made. In any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to his or her attorney's fees and costs.

"The sanctions authorized under this section shall be separate from, and in addition to, all other remedies either civil, administrative, or criminal.

"This section applies to all private works of improvement and to all public works of improvement, except where Section 10262 of the Public Contract Code applies."

[8] Public Contract Code section 7107 reads in relevant part: "(d) Subject to subdivision (e), within seven days from the time that all or any portion of the retention proceeds are received by the original contractor, the original contractor shall pay each of its subcontractors from whom retention has been withheld, each subcontractor's share of the retention received. However, if a retention payment received by the original contractor is specifically designated for a particular subcontractor, payment of the retention shall be made to the designated subcontractor, if the payment is consistent with the terms of the subcontract.

"(e) The original contractor may withhold from a subcontractor its portion of the retention proceeds if a bona fide dispute exists between the subcontractor and the original contractor. The amount withheld from the retention payment shall not exceed 150 percent of the estimated value of the disputed amount.

"(f) In the event that retention payments are not made within the time periods required by this section, the public entity or original contractor withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs."

in an action to collect amounts wrongfully withheld. (Bus. & Prof. Code, § 7108.5; Pub. Contract Code, § 7107, subd. (f).)

In this matter, the trial court imposed penalties against Monterey under both statutes. It determined (1) Tesco was a subcontractor of Monterey; (2) Tesco was owed both a progress payment and a retention payment by Monterey; (3) Monterey had been paid for the progress payments and retentions it owed Tesco; and (4) Monterey had a good faith dispute with Tesco but it withheld more than the 150 percent allowed under the statutes.

Before us, Monterey argues the trial court incorrectly determined (1) Tesco was a subcontractor of Monterey; (2) Tesco proved Monterey had been paid for the progress payments and retentions it owed Tesco; and (3) Monterey withheld more than 150 percent of the amount in dispute. Monterey also claims the purchase order established payment terms different than those imposed by Business and Professions Code section 7108.5. We assess each argument.

B. *Analysis*

1. *Tesco as subcontractor of Monterey*

In addition to the undisputed facts discussed above, the trial court after trial determined Stratton defaulted on its subcontract with Monterey in September of 1999. Although Tesco had completed invoicing for its services, Tesco's work under the purchase order apparently was not yet completed. That month, Ed Moore, Monterey's project manager, told Tesco he desired to work with Tesco to complete the project. He stated if Tesco could complete certain items leading up to a particular 30-day test, he could apply for a progress billing for Tesco.

Tesco continued working on the project through the end of 1999, and completed change orders after that. Meanwhile, Monterey terminated Stratton from the project in March 2000. Stratton declared bankruptcy on April 10, 2000. Tesco then worked directly for Monterey, completing change orders given it by Monterey through June 2000. The City signed a notice of completion on the project on January 10, 2001.

From these findings, the trial court determined Tesco became a subcontractor of Monterey at some point around April 2000, but no later than May 1, 2000. From the point Monterey terminated Stratton, the court reasoned, Tesco became a subcontractor to Monterey under what the court said was an implied contract, but in fact was an oral contract. Tesco thus should have

been paid directly by Monterey within the times required by the prompt payment statutes. Substantial evidence supports this determination.[9]

 For purposes of the prompt payment statutes, a contractor is any person "who undertakes to . . . construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building . . . ." (Bus. & Prof. Code, § 7026.) The evidence here demonstrated Tesco did more than simply furnish materials or supplies to be used in the project. It constructed part of the treatment plant's control system in accordance with the custom specifications drawn up for Tesco's work. In the context of mechanic's lien law, that fact renders Tesco a subcontractor. (*Theisen v. County of Los Angeles* (1960) 54 Cal.2d 170, 183 [5 Cal.Rptr. 161, 352 P.2d 529].) Since the prompt payment statutes serve a similar purpose as the mechanic's lien law, ensuring payment to subcontractors, the *Theisen* holding is applicable here. (Cf. *Steinbrenner v. J. A. Waterbury Constr. Co.* (1963) 212 Cal.App.2d 661, 664–666 [28 Cal.Rptr. 204] [maker of custom cabinets for building project not a subcontractor for purposes of contractor licensing law where he did not himself install the cabinets; purpose of licensing law is to protect the public].)

Moreover, the evidence demonstrated Monterey orally contracted with Tesco when it requested to work directly with Tesco in finishing the project and agreed to obtain a progress payment for Tesco if Tesco completed the work. Tesco did complete the work, and performed additional work under change orders requested directly by Monterey. This evidence is sufficient to sustain the trial court's finding Tesco became a subcontractor of Monterey in April 2000.

### 2. *Payments to Monterey and withholding of disputed amounts*

The trial court determined Monterey was paid for Tesco's progress payments on an ongoing basis. Because Tesco had completed most of its work by April 2000 and had become a subcontractor by that time, the trial court reasoned, Monterey "should have billed and received payment [from the City] for a comparative percentage of Tesco's work by April of 2000." The court imposed penalties on the amount Monterey owed Tesco from May 1, 2000, to June 2001, when Monterey paid Tesco $217,262.98.

 The prompt payment statutes, however, are not triggered by whether the general contractor "should have" received a payment from the owner.

[9] Because we conclude Tesco worked pursuant to an oral contract, we need not reach defendants' assertion that Tesco failed adequately to plead the existence of an implied contract. Were we to reach that issue, we would hold Tesco's complaint satisfied the requirements for pleading on the implied contract: "[O]nly the facts from which the promise is implied must be alleged." (*Youngman v. Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 247 [74 Cal.Rptr. 398, 449 P.2d 462].)

Rather, they begin to run upon the general contractor actually receiving a progress payment. (Bus. & Prof. Code, § 7108.5; Pub. Contract Code, § 7107, subd. (d).) Here, the only evidence in the record regarding Monterey's receipt of payments demonstrated the last time the City paid Monterey before Tesco became a subcontractor was on September 30, 1999, and the City did not pay Monterey again until March 14, 2001.

As a result, in this case, the prompt payment statutes were not triggered until at least March 14, 2001, the date of the first progress payment Monterey received from the City after Tesco became a subcontractor. As of March 14, 2001, Tesco had invoiced all of its work and was owed $412,024.98. The parties at that time were disputing whether Monterey owed Tesco $194,762. Under the prompt payment statutes, Monterey was allowed to withhold 150 percent of the disputed amount, or an amount equal to $292,143. Monterey improperly withheld $119,871.98 over that amount, and did so until June 2001, when it paid Tesco $217,262.98, leaving Tesco short $194,762. We will remand this matter to the trial court for it to determine the appropriate penalty based on the analysis above.

Monterey argues the prompt payment statutes do not apply because the parties agreed to different terms in writing. This is incorrect. In the joint check agreement, Monterey agreed to pay Tesco when normal progress payments were due. Under the purchase order, Stratton agreed to pay Tesco 10 days after it received payment from either Monterey or the City. Thus, the parties agreed to the same terms as those included in the statute.

Monterey also argues it lawfully withheld all amounts because its subcontract agreement with Stratton allowed it to withhold sums greater than 150 percent of disputed amounts under certain circumstances. However, Business and Professions Code section 7108.5 and Public Contract Code section 7107 prohibit contractors from withholding more than 150 percent of the disputed amount.

We will thus reverse the judgment on Tesco's eighth cause of action and order the court to calculate the correct amount of penalties in accordance with this opinion.

V

*Dismissal of Misrepresentation Claim in Cross-complaint*

Monterey argues the trial court erred when it dismissed its cause of action for misrepresentation in its cross-complaint. It claims Tesco admitted its

statements in the March 15, 1999, lien release were false. Monterey allegedly relied on that release and thus overpaid Stratton the remaining balance of the January progress payment.

Monterey ignores the facts as found by the trial court. The trial court determined the release was not false, but was based upon the amount allowed by Stratton, i.e., materials actually incorporated into the project as opposed to materials and services invoiced. The court specifically found Tesco had not admitted the release was false. Substantial evidence supports the trial court's determinations.

## DISPOSITION

The judgment as to Tesco's eighth cause of action against Monterey is reversed and remanded to the trial court with directions to enter judgment in accordance with this opinion. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 27(a)(3).)

Sims, Acting P. J., and Davis, J., concurred.

A petition for a rehearing was denied December 22, 2004.