[Civ. No. 50391. Second Dist., Div. Four. Feb. 7, 1978.]

TOLSTOY CONSTRUCTION COMPANY,
Plaintiff, Cross-defendant and Respondent, v.
MAMIE R. MINTER, Defendant, Cross-complainant and Appellant.

**COUNSEL**

Charlotte Low for Defendant, Cross-complainant and Appellant.

Mike Mayo for Plaintiff, Cross-defendant and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—This case involves a suit for breach of a contract to build a residence. Plaintiff Tolstoy Construction Company sought $7,301.16 in damages and requested attorney fees from the residence's owner, Mamie R. Minter. Defendant Minter answered the complaint, denying liability on the ground that plaintiff had failed to perform the contract in a substantial and workmanlike manner. Defendant also cross-complained for damages of $25,000 for plaintiff's breach of the same contract and $5,000 for plaintiff's breach of a second contract between the parties.

Trial was by the court. Judgment was granted to plaintiff in the amount of $5,000 as damages and $550 for attorney's fees. Defendant was denied relief on her cross-complaint. Defendant has appealed from the judgment.

Defendant attacks the sufficiency of the evidence to support the judgment. The appropriate standard of review in assessing such an attack is to "view the facts in the light most favorable to [the prevailing party below], giving [that party] the benefit of every reasonable inference and resolving all conflicts in [that party's] favor . . . ." (*Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 367 [131 Cal.Rptr. 78, 551 P.2d 398].) "A reviewing court must uphold an award of damages whenever possible [citation] and all presumptions are in favor of the judgment [citations]." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 61 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

With these principles in mind, we review the evidence adduced below.

Defendant owned an antique shop in Montebello, and, in 1973, was referred by a real estate agent to Jack J. Tolstoy, a licensed building contractor doing business as plaintiff company, concerning the construction of a residential unit on top of the antique shop where defendant would live. Tolstoy drew some tentative plans for the residence and discussed them with defendant. The plans were not complete; they did not show the location of electrical outlets or the water supply for the residential unit. Nor did they show that it would be necessary, in order to construct the staircase to the upper unit, to remove and relocate the water heater servicing the antique shop on the first floor.

Defendant asked for some changes, but basically approved the plans submitted to her. She was told that the changes would be incorporated in the plans to be submitted to the Montebello Building Department (hereinafter, the Department).

On April 26, 1973, plaintiff company, by Jack J. Tolstoy, and defendant signed a document which had been prepared by Tolstoy entitled "Prime Construction Contract." It, too, was devoid of details of the proposed construction, providing only that plaintiff would build for defendant a 2-bedroom apartment of approximately 1,100 square feet on top of the rear of the antique shop, "per plans submitted." Total price was to be $21,500, of which $250 was payable upon execution of the agreement. No provision was made for installment payments, but extras and allowances were defined. Performance was to be completed within 125 days from the time defendant notified the contractor that the building site was available.

After the contract was signed, an amended set of plans, drawn by Bill, Jack J. Tolstoy's son, was submitted to the Department. The plans showed one change defendant had requested (relative to bedroom size) but not the other (inclusion of a broom closet). Defendant did not see these plans. The Department directed some additional changes, including the construction of a carport, because the local code required a carport when the property use was to be mixed commercial-residential. The building permit was issued June 8, 1973, and construction began.

On June 29, 1973, defendant was presented with a letter by Tolstoy outlining the installment payments required during the course of construction. Defendant did not assent to this payment schedule either orally or in writing, but did make four timely installment payments pursuant to the letter's timetable during the summer of 1973.

Various difficulties were encountered. The problem of the water heater was discussed by the parties and it was decided to place it in the upper unit's second bathroom, although the contractor knew that a gas-fueled water heater standing open in the bathroom violated the local building code. The carport, built in August 1973, had to be moved; defendant asked that it be expanded so that it would abut the adjoining property, which she owned. This direction was not followed; a four and one-half-foot gap was left between the carport and the adjoining property. Appliances promised by the contractor did not materialize; defendant purchased them herself.

The antique shop was painted barn red, and it was defendant's instruction to plaintiff to have the stucco addition match the lower unit in color. There was something wrong with the paint used; it streaked. Tolstoy testified that he attempted to remedy the condition. There was testimony at trial from other witnesses that paint continued to come off the walls on the hands of anyone who touched the walls.

The job was essentially completed in October 1973. In mid-November 1973 there was a heavy rain and water flooded the antique shop, coming from the ceiling at the shop's rear, through a light fixture. (The residence was located above this point.) One of plaintiff's employees, Bill Tolstoy, arrived and attempted to patch the ruptures. There was general agreement among the witnesses called at trial by defendant, a roofing contractor and a general contractor, that the area of difficulty was where the new construction joined the old, and that to solve the problem of water collecting on the building reconstruction would be required (ranging in price from $600 to $900). The mid-November rains did some damage to defendant's merchandise in the shop.

Defendant moved into the upstairs unit in November 1973. Department Inspector Patterson testified at trial that a certificate of occupancy was not issued for the unit, due to the open condition of the water heater. Defendant was not satisfied with the residence, and on December 28, 1973, refused to pay the fifth installment payment set forth in the schedule prepared by Tolstoy.

In January 1974, after plaintiff had refused to work further because of lack of payment, defendant contacted the Contractor's State License Board, seeking their assistance. A representative of that board met with contractor Tolstoy and defendant. The result of that meeting was that the contractor was provided with a list of defendant's complaints, but it appears that no corrections were attempted after that meeting.

The list was introduced at trial. In addition to the problems already encountered by defendant, these conditions were noted: areas of wood left unpainted; nailheads showing throughout the construction; no insulation; misaligned doors, windows and light switches; cracks in kitchen tile and around doors; chipped tile in bathrooms, and no light switch at all in one bathroom. Defendant did not get her broom closet.

There was also evidence at trial concerning the carport. Defendant's expert, contractor Rendon, stated that the carport had been constructed

so poorly that it was visibly "out of plumb." Rendon inspected the entire construction, and testified that it was of such inferior quality as to constitute an unworkmanlike job. At trial, contractor Tolstoy acknowledged that there had been problems and complaints but indicated that his employees had made efforts to remedy them although he himself had not been at the job site since December 1973.

The trial court found that plaintiff had "substantially performed all of the conditions, covenants and promises under the written contract . . . the plans and specifications, by January, 1974." It also determined that "the value of the work not performed by the plaintiff pursuant to his contract [was] the sum of $2,301.16 which [included] $1,800.00 claimed as his extra for the carport." It was concluded that "plaintiff did not breach his contract by failing to complete the same and that any failure to complete it was not substantial and that defendant suffered no damages by reason of plaintiff's breach, if any." The judgment reflected that the trial court, in invoking the doctrine of substantial performance, employed the arithmetic set forth in such cases as *Lowy* v. *United Pacific Ins. Co.* (1967) 67 Cal.2d 87 [60 Cal.Rptr. 225, 429 P.2d 577], by subtracting from the contractor's total demand ($7,301.16) for the remaining balance due on the contract and his extras, that sum which the court determined represented plaintiff's lack of contractual performance ($2,301.16)—including the entire cost of the carport—and awarded to the contractor the difference ($5,000.00) plus attorney fees ($550).

Defendant contends that the state of the evidence was such that it was error for the trial court to invoke the doctrine of substantial performance, thereby allowing the contractor to recover any further amount. We agree.

The doctrine of substantial performance has been recognized in California since at least 1921, when the California Supreme Court decided the landmark case of *Thomas Haverty Co.* v. *Jones* (185 Cal. 285, 288-289 [197 P. 105]), in which it was stated: "The general rule on the subject of [contractual] performance is that 'Where a person agrees to do a thing for another for a specified sum of money to be paid on full performance, he is not entitled to any part of the sum until he has himself done the thing he agreed to do, unless full performance has been excused, prevented or delayed by the act of the other party, or by operation of law, or by the act of God or the public enemy.' . . . [I]t is settled, especially in the case of building contracts where the owner has

taken possession of the building and is enjoying the fruits of the contractor's work in the performance of the contract, that if there has been a substantial performance thereof by the contractor in good faith, where the failure to make full performance can be compensated in damages to be deducted from the price or allowed as a counterclaim, and the omissions and deviations were not willful or fraudulent and do not substantially affect the usefulness of the building for the purposes for which it was intended, the contractor may, in an action upon the contract, recover the amount unpaid of his contract price, less the amount allowed as damages for the failure in strict performance."

The doctrine remains the law of California today. (See *Lowy, supra,* 67 Cal.2d 87; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, §§ 588-589, pp. 503-504.)

█ What constitutes "substantial performance" "is always a question of fact, a matter of degree, a question that must be determined relatively to all the other complex factors that exist in every instance." (3A Corbin on Contracts (1960) § 704, p. 318.)

Although the *Haverty* court observed that the question "is one of some difficulty" (185 Cal. 285, 291), it stated the guiding principle to be that "there is a substantial performance where the variance from the specifications of the contract does not impair the building or structure as a whole, and where after it is erected the building is actually used for the intended purpose, or where the defects can be remedied without great expenditure and without material damage to other parts of the structure, *but that the defects must not run through the whole work so that the object of the owner in having the work done in a particular way is not accomplished,* or be such that a new contract is not substituted for the original one, nor be so substantial as not to be capable of a remedy and the allowance out of the contract price will not give the owner essentially what he contracted for." (*Haverty, supra,* 185 Cal. 285, 291.) (Italics added.)

█ Courts in California have denied contractors the right to recover pursuant to the doctrine of substantial performance where their performance was not found to meet a reasonable standard. (See *Shell v. Schmidt* (1958) 164 Cal.App.2d 350 [330 P.2d 817, 76 A.L.R.2d 792];

*Williams* v. *Elliott* (1954) 127 Cal.App.2d 357 [273 P.2d 953]; *Bause* v. *Anthony Pools, Inc.* (1962) 205 Cal.App.2d 606 [23 Cal.Rptr. 265].)

■ In the case at bench, defendant owner, inexperienced in such matters, selected a licensed contractor to build her what he promised would be a "real nice house." As imperfect as the contract and the plans were in spelling out in any detail how this was to be accomplished, implicit in the contract was the condition that the workmanship promised would be of reasonable quality. ■ Indeed, the whole legislative scheme of licensing building contractors contemplates limiting the issuance of such licenses to those in possession of "such degree of knowledge and experience . . . and such general knowledge of the building, safety, health and lien laws . . . as [are deemed necessary] for the safety and protection of the public." (Bus. & Prof. Code, § 7068.) Defendant was entitled to rely on the fact that Tolstoy was licensed.

■ What defendant contracted for and what she actually received were two entirely different things. Defendant desired a home of reasonable quality. She got a building addition and a carport so poorly constructed that it will take substantial amounts of money to make the dwelling reasonably tenantable.[1] The basic misalignment of doors and windows is not subject to remedy. While some of the defects were minor, one noted commentator has observed that "[t]he performance rendered may be held to be less than substantial by reason of the accumulation of many defects, any one of which standing alone would be minor in character." (Corbin, *supra*, § 706, fn., p. 323.)

■ Although it is clear from the record that defendant has suffered severe damage as a result of the manifold imperfections in plaintiff's work, she offered insufficient evidence to support a judgment in her favor on her cross-complaint. Under these circumstances, the judgment adverse to her on her cross-complaint was proper.

■ But the trial court committed reversible error when it applied the doctrine of substantial performance in the case at bench, allowing the contractor to recover on his contract. It should have been denied relief.

---

[1]We note that Civil Code section 1941.1 defines "untenantable" as a dwelling which lacks certain characteristics, including, but not limited to "(a) Effective waterproofing and weather protection . . . . [¶] (b) Plumbing facilities which conformed to applicable law . . . ."

That portion of the judgment denying relief to defendant on her cross-complaint is affirmed. Otherwise, the judgment is reversed with directions to the trial court to enter judgment for defendant.

Each party is to bear its own costs on appeal.

Files, P. J., and Kingsley, J., concurred.