[No. H030146. Sixth Dist. Jan. 15, 2008.]

MURRAY'S IRON WORKS, INC., Plaintiff and Respondent, v. PHILLIP R. BOYCE, Defendant and Appellant.

COUNSEL

Gates, Eisenhart & Dawson, Nicholas G. Emanuel and James L. Dawson for Defendant and Appellant.

Abdulaziz, Grossbart & Rudman, Kenneth S. Grossbart, Bruce D. Rudman; Thomas O'Hagan and Harvey L. Goldhammer for Plaintiff and Respondent.

OPINION

**ELIA, J.**—This case involves a suit for breach of a contract to build and install decorative ironwork at the residence of appellant Phillip R. Boyce (hereafter Boyce).[1] Plaintiff, Murray's Iron Works, Inc. (hereafter MIW), sought $66,222.44 in damages together with interest thereon and requested attorney fees and cost of suit from Boyce. Boyce cross-complained.[2] Eventually, on January 17, 2006, the matter proceeded to jury trial. On January 23, 2006, Boyce filed a motion for nonsuit pursuant to Code of Civil Procedure section 581c, subdivision (a). Ultimately, the court denied the motion for nonsuit. On January 26, 2006, the jury rendered special verdicts finding in favor of MIW. The jury awarded MIW $66,222.40 on the breach of contract cause of action, and $49,004.65 in civil penalties. The court entered judgment on the special verdicts on February 7, 2006. On the same date, the court served notice of entry of judgment. MIW filed a memorandum of costs on February 15, 2006, and a motion for attorney fees.

Subsequently, on February 16, 2006, Boyce filed a motion for judgment notwithstanding the verdict (JNOV) or in the alternative an order granting a new trial.

---

[1] Murray's Iron Works, Inc., filed a complaint for damages asserting causes of action for breach of contract, quantum meruit and account stated.

[2] Boyce alleges that he cross-complained for breach of contract, violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) and breach of warranty. Unfortunately, Boyce has not provided this court with the cross-complaint. Accordingly, issues raised in this appeal are limited to the complaint filed by MIW. (Cal. Rules of Court, rule 8.130(a)(5).)

The court heard MIW's motion for attorney fees and Boyce's motion for JNOV/new trial on March 22, 2006. The court denied Boyce's motion, but granted MIW's attorney fees motion. In so doing, the court awarded MIW $110,000.00 in attorney fees and $10,090.23 in costs. The court ordered that these amounts be inserted on the special verdict forms. That order was entered on April 7, 2006, following approval as to form and content by counsel.

A notice of service of modified judgment was served on April 13, 2006. Thereafter, Boyce filed a notice of appeal on April 28, 2006.[3]

On appeal, Boyce raises four issues. First, he contends that the motion for nonsuit should have been granted because the evidence established a prima facie case for breach of contract. Second, a jury instruction regarding awarding penalties pursuant to Civil Code section 3260.1 should not have been given because the statute has no application to this case. Third, the motion for JNOV/new trial should have been granted because MIW failed to establish a prima facie case of breach of contract and because Civil Code section 3260.1 is not applicable to this case. Finally, MIW's motion for attorney fees should have been denied because Civil Code section 3260.1 does not apply to this case. We agree that Civil Code section 3260.1 has no application in this case. Accordingly, we reverse the award of penalties and attorney fees. In all other respects, we affirm the judgment.

## Standard of Review

On appeal from the denial of a JNOV motion, this court reviews the record in order to make an independent determination whether there is any substantial evidence to support the jury's findings. (*Paykar Construction, Inc. v. Spilat Construction Corp.* (2001) 92 Cal.App.4th 488, 493–494 [111 Cal.Rptr.2d 863]; *Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057–1058 [103 Cal.Rptr.2d 790] (*Tognazzini*).) The scope of the review is limited to determining whether there is any substantial evidence, contradicted or not, to support the jury's verdict. (*Begnal v.*

---

[3] Boyce appealed from "the entire Judgment on special verdict entered on February 7, 2006, . . . and from the Order on (1) . . . Boyce's Motion for Judgment Notwithstanding the Verdict, or In the Alternative For Order Granting New Trial and (2) . . . [MIW] Motion for Attorney Fees and Request for Costs, entered on April 7, 2006." On June 1, 2006, Boyce's appeal was dismissed under California Rules of Court, former rule 8(b) for failure to procure the record. However, after a motion to set aside the dismissal, dismissal was set aside on June 28, 2006.

*Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 72 [92 Cal.Rptr.2d 611] (*Begnal*).) Applying the substantial evidence rule, we resolve "all conflicts in the evidence and all legitimate and reasonable inferences that may arise therefrom in favor of the jury's findings and the verdict. [Citations.]" (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1137–1138 [74 Cal.Rptr.2d 510].) Thus, this court must accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict. (*Begnal, supra*, 78 Cal.App.4th at p. 72.) Accordingly, we do not weigh the evidence or judge the credibility of the witnesses. (*Tognazzini, supra*, 86 Cal.App.4th at p. 1058.) If sufficient evidence supports the verdict, we must uphold the trial court's denial of the JNOV motion. (See *Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730 [60 Cal.Rptr.2d 698].)

Similarly, we review the ruling on a motion for nonsuit independently, guided by the same rules that govern the trial court. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541–1542 [50 Cal.Rptr.2d 395].) "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].) Accordingly, "We will not sustain the judgment ' " 'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' ". . .' " (*Ewing v. Northridge Hospital Medical Center* (2004) 120 Cal.App.4th 1289, 1296 [16 Cal.Rptr.3d 591].)

With these standards of review in mind, we recite the facts of this case.[4]

---

[4] Boyce did not provide this court with any of the exhibits that were admitted into evidence. Pursuant to California Rules of Court, rule 8.155(a), we requested that the record be augmented to include the exhibits.

*Facts and Proceedings Below*

MIW, a California corporation, has been in existence since 1967. It is a blacksmithing workshop specializing in ornamental architectural metalwork. Typically, MIW makes railings, entry gates and doors. Most of MIW's customers are interior designers and architects. Ed Leisner is the president of MIW.

MIW has manufactured and installed ornamental metalwork in over 1,100 five star hotels around the world. MIW's biggest project to date was the grand staircase at the Bellagio Hotel in Las Vegas.

Mark Morris, an interior designer, met Boyce around October 2000. Morris became the designer on Boyce's residence. At some point, Morris became aware of MIW.[5] Morris was aware that Boyce planned to have ironwork installed in his home, including a staircase, balcony, large doors and an exterior railing. MIW's San Francisco representative told Morris that Ed Leisner was responsible for the architectural ironwork at MIW. Some time in September 2000, Leisner received a phone call from Boyce at his office at MIW's workshop in Los Angeles. Boyce told him that he was interested in some neoclassic French ironwork for the private home he was building. Leisner arranged for Boyce and his wife Susan to visit MIW. During this meeting, Gary Hatch was the only other person present. At the time, Hatch was a part-time employee of MIW whom Leisner was "grooming to take over more of the responsibilities for the architectural work."

While at MIW, Boyce toured the facility and saw a chandelier undergoing the gold leafing process. Either Boyce or his wife asked if MIW recycled the flakes on the floor. Leisner indicated that they did not because it had no intrinsic value; it was imitation gold leaf. Then, Boyce indicated that he wanted genuine gold leaf on his railing. Leisner told him that MIW did not use genuine gold leaf because he did not have anybody that knew how to do it.

After several design ideas were passed back and forth, on July 2, 2001, MIW provided Boyce a quotation for two pairs of iron doors with glass inserts, balcony and staircase railings and an interior main staircase. According to the quotation, the iron was to be finished with "Exterior Grade Hand Painted Premium scratch & mar resistant Finish with Rust inhibiting Primer

---

[5] According to Morris, he contacted MIW around May of 2001.

and Seal Coat including Dark Gold Leaf Details. [MIW] has over 80 standard finishes and custom finishes are quoted on request. Final selection to be approved." Modifications to the original scope of work were made due to a decrease in the linear footage of the railings. A revised quotation dated August 7, 2001, was prepared and Hatch traveled to Saratoga and met with Boyce. Interlineations were made to the proposal, which Boyce signed. The total cost for the project was $195,771.40. This quotation formed the operative contract.

MIW and Boyce agreed that payment would be made pursuant to the following terms: "50% Deposit/Net upon Satisfactory Completion of Project." On August 29, MIW received a check from Boyce in the amount of $96,725.

Subsequently, MIW prepared sample sections for final approval of the finish. On January 10, 2002, MIW received a letter from Morris addressed to Gary Hatch, which stated that "the sample was really beautiful." However, the letter indicated that Boyce wanted to change some of the finish on the details of the railing. Since the changes involved more work and more cost, MIW wrote back informing Boyce that there would be an additional charge of 10 percent.

Ultimately, by June 10, 2002, the installation of the ironwork was almost completed. Around this time, MIW received a letter from Morris addressed to Boyce and Hatch that described the doors that MIW had installed as "faaaaabulous!!!" MIW completed the installation, finishing the job on or about July 16, 2002. Accordingly, MIW sent out a final invoice. The total invoice with tax was for $212,947.40. The invoice reflected the original deposit that had been paid leaving a balance of $116,222.40. MIW did not receive any payment within 30 days. Accordingly, Hatch called Boyce. MIW received no response. Between July 16 and September 1, 2002, MIW did not hear from Morris or Boyce regarding the invoice.

On September 6, 2002, MIW received a "running punch list," which is a list of minor jobs the owner, or designer in this case, would like fixed.

Leisner testified that on approximately 25 percent of architectural jobs MIW would have to go back to take care of minor items. By December 31, 2002, MIW had taken care of all the items on the punch list. However, MIW had not received full payment on the July 16 invoice. MIW received a check

dated October 28, 2002, from Boyce in the amount of $50,000, which included the following notation in the memo line—"Att[ention] Gary Hatch. This is not an ac[c]eptance of job." However, MIW was not given any indication of why the job was not considered accepted. MIW attempted to collect the balance of $66,222.40. According to Leisner he called Boyce a number of times, but was not able to speak with him.

MIW was called out again to perform additional work on the house in January 2003. Boyce wanted the acorns or finials on the interior railing gilded. MIW completed the work, but was still not able to collect the $66,222.40. Sometime in February 2003, MIW received a letter dated February 10, 2003, from Morris. The letter stated, "We believe that imitation gold leaf was used in the exterior, interior and doors. We found a box during cleanup. This is an important difference from the specification." Leisner testified that at this point he felt "The writing was on the wall. They were going to use this . . . as an excuse not to pay us."

Leisner testified that there was no specification contained in either of the two quotes that he gave Boyce, one of which Boyce had signed, that called for MIW to install real gold.

In a letter dated March 12, 2003, MIW attempted to point out to Boyce that his claim that he was supposed to get real gold on his ironwork was "ridiculous."[6] MIW did not receive an immediate response. MIW sent a second letter dated April 10, 2003, in which MIW stated, "Based on the cost and complexity, a reasonable person, especially an experienced interior designer, would realize that 22-carat gold leaf would not be included in the price. [MIW] never claimed that it was 22-carat gold leaf."

Subsequently, MIW received a letter from Boyce dated May 6, 2003. The letter stated that Boyce "completely disagree[d] in regards to the use of **real** gold leaf." The letter went on, "When Sue and I first came to your factory over three years ago to discuss this commission, I made it clear from our first meeting after I asked you if you could do gold leaf, that my experience convinced me that the use of **real** gold leaf exteriorly and interiorly was very important. You stated that it was an expensive issue and I agreed and asked you to bid it appropriately." Leisner denied that he had ever told Boyce that it was too expensive to do real gold leaf or that Boyce asked him to use real gold leaf because MIW does not do it.

MIW sent another letter to Boyce trying to convince him to pay the balance of the July 16 invoice. MIW was never paid the balance.

---

[6] The letter stated that the "Gold Leaf was accomplished as approved and the issue of Dutch versus 22K is very unreasonable."

MIW filed a complaint for damages on January 4, 2004.

During the trial, Leisner testified that MIW had installed a coat of "Bondo" and caulking to the exterior ironwork, but normally MIW goes back to check that no gaps have developed. On the Boyce project they came back to complete the check to see if the "Bondo" was working correctly. They found a small problem with the "Bondo" on a small section of the exterior ironwork, but they were not able to fix it because it was raining. MIW made arrangements to fix the problem. However, Leisner instructed his workers not to go back once he received the fax from Morris that said that imitation gold leaf had been used on the Boyce project. At that time, there was "probably an hour and a half worth of bondoing to do after the hour that you have to wait to have it put together. There's probably a day maybe a day and a half of painting because it takes time." Leisner conceded that he had not told Boyce or anyone else that without the completed "Bondo" work there would be a problem with "water down the road."

At the conclusion of MIW's case-in-chief, as noted, Boyce filed a motion for nonsuit. The grounds for the motion were that Leisner testified that MIW intentionally did not complete the entire process necessary to seal and waterproof the ironwork. Thus, the evidence presented by MIW failed to state a cause of action for breach of contract. The court denied the motion for nonsuit.

It appears that the court instructed the jurors that if they found Boyce wrongfully withheld payment to MIW, then Boyce was subject to a charge of 2 percent per month on the improperly withheld amount. Boyce has not provided this court with any of the record that contains the set of instructions that were given by the court, or the reporter's transcript of the proceedings. However, Judge Nichols issued a notice of ruling dated January 26, 2006, which states "The court instructed the jury on the 2% charge claim, over Mr. Boyce's objection." MIW concedes that the court instructed the jury regarding a 2 percent penalty sought by MIW under Civil Code section 3260.1.

Following the jury's verdict, Boyce filed a motion for JNOV/order granting a new trial on the grounds that MIW failed to present a prima facie case as to the breach of contract claim and that the 2 percent statutory penalty was contrary to law. As noted, the court denied the motion.

*Discussion*

Initially, MIW contends that the denial of Boyce's prejudgment motion for nonsuit is not properly before this court. Essentially, MIW argues that

because Boyce appealed from "the entire Judgment on Special Verdict entered on February 7, 2006 . . . and from the Order on (1) . . . Motion for Judgment Notwithstanding the Verdict . . . (2) . . . Motion for Attorneys fees and Request for Costs, entered on April 7, 2006 . . . ." and did not designate the entire record on appeal, the denial of the motion for nonsuit is not properly before this court. We disagree.

An order denying a motion for nonsuit, while not directly appealable, may be reviewed on appeal from the subsequent judgment for the plaintiff. (*Torres v. City of Los Angeles* (1962) 58 Cal.2d 35 [22 Cal.Rptr. 866, 372 P.2d 906]; *Gettemy v. Star House Movers, Inc.* (1964) 225 Cal.App.2d 636, 647–648 [37 Cal.Rptr. 441], disapproved on other grounds by *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235 [108 Cal.Rptr.2d 617, 25 P.3d 1096].) Here Boyce has appealed from the judgment. Although Boyce did not designate the entire record on appeal, MIW fails to point to any part of the record that is missing that would prevent this court from addressing the nonsuit issue.[7]

Furthermore, although Boyce contends there are four separate issues on appeal there are only two real issues.[8] First, whether any evidence supported MIW's position that it performed or substantially performed all work required under the contract with Boyce. Second, whether the 2 percent penalty pursuant to Civil Code section 3260.1 was properly awarded to MIW.

*Sufficiency of the Evidence*

Boyce contends that there was no evidence to support at least one required element of MIW's breach of contract claim. Specifically, MIW was required to show that all conditions required for his performance had occurred, because his "duty to pay the balance of the contract price was conditioned upon the project first being satisfactorily completed." Accordingly, in order to state a claim for breach of contract, MIW needed to present sufficient evidence that the project was satisfactorily completed.

Judicial Council of California Civil Jury Instructions (2007) CACI No. 312 provides: "[*Name of defendant*] contends that [*name of plaintiff*] did not perform all of the things that [he/she/it] was required to do under the contract, and therefore [*name of defendant*] did not have to perform [his/her/its]

---

[7] Boyce's notice to prepare a reporter's transcript requested the preparation of the oral proceedings that took place on January 19, 20, 23, and 24. As far as this court can tell, we have received all the witness testimony that the jury heard in this case.

[8] Boyce contends that the trial court erred in denying his motion for nonsuit and motion for JNOV/new trial. As to both issues, his argument is that the evidence presented at trial established that MIW did not complete the work called for by the contract.

obligations under the contract. To overcome this contention, [*name of plaintiff*] must prove both of the following: [¶] 1 That [*name of plaintiff*] made a good faith effort to comply with the contract; and [¶] 2 That [*name of defendant*] received essentially what the contract called for because [*name of plaintiff*]'s failures, if any, were so trivial or unimportant that they could have been easily fixed or paid for."

It appears that the instruction as given by the court to the jury was as follows: "PHILIP BOYCE contends that MURRAY'S IRON WORKS, INC. did not perform all the things that it was required to do under the contract, and therefore PHILLIP BOYCE did not have to perform his obligation under the contract. To overcome this contention, MURRAY'S IRON WORKS, INC. must prove both of the following: [¶] 1. That MURRAY'S IRON WORKS, INC. made a good faith effort to comply with the contract; and [¶] 2. That PHILIP BOYCE received essentially what the contract called for because MURRAY'S IRON WORKS, INC.'s failures, if any, were so trivial or unimportant that they could have been easily fixed or paid for."[9]

The jury was asked to answer the following question. "Did MURRAY'S IRON WORKS, INC do all, or substantially all, of the significant things that the contract required it to do?" By a vote of 12 to zero, the jury said "Yes."

■ "At common law, recovery under a contract for work done was dependent upon *complete* performance, although hardship might be avoided by permitting recovery in *quantum meruit.* The prevailing doctrine today, which finds its application chiefly in building contracts, is that *substantial performance* is sufficient, and justifies an action on the contract, although the other party is entitled to a reduction in the amount called for by the contract, to compensate for the defects. What constitutes substantial performance is a question of fact, but it is essential that there be no wilful departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so that the promisee may get practically what the contract calls for." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 818, p. 908.)

■ The doctrine of substantial performance has been recognized in California since at least 1921, when the California Supreme Court decided the landmark case of *Thomas Haverty Co. v. Jones* (1921) 185 Cal. 285, 288–289 [197 P. 105] (*Haverty*), in which the court stated: "The general rule

---

[9] We reiterate that Boyce has not provided this court with a complete set of jury instructions that the trial court gave to the jury. However, since MIW does not contest that the instruction was given and because the record contains a copy of the instruction, which is attached to MIW's pleading in opposition to Boyce's motion for JNOV/new trial, we will overlook this omission.

on the subject of [contractual] performance is that 'Where a person agrees to do a thing for another for a specified sum of money to be paid on full performance, he is not entitled to any part of the sum until he has himself done the thing he agreed to do, unless full performance has been excused, prevented or delayed by the act of the other party, or by operation of law, or by the act of God or the public enemy.' [Citation.] . . . [I]t is settled, especially in the case of building contracts where the owner has taken possession of the building and is enjoying the fruits of the contractor's work in the performance of the contract, that if there has been a substantial performance thereof by the contractor in good faith, where the failure to make full performance can be compensated in damages to be deducted from the price or allowed as a counterclaim, and the omissions and deviations were not willful or fraudulent and do not substantially affect the usefulness of the building for the purposes for which it was intended, the contractor may, in an action upon the contract, recover the amount unpaid of his contract price, less the amount allowed as damages for the failure in strict performance. [Citations.]"

In *Haverty*, *supra*, 185 Cal. at page 291, the court observed that the question "is one of some difficulty." Nevertheless, it stated the guiding principle to be that "there is a substantial performance where the variance from the specifications of the contract does not impair the building or structure as a whole, and where after it is erected the building is actually used for the intended purpose, or where the defects can be remedied without great expenditure and without material damage to other parts of the structure, but that the defects must not run through the whole work so that the object of the owner in having the work done in a particular way is not accomplished, or be such that a new contract is not substituted for the original one, nor be so substantial as not to be capable of a remedy and the allowance out of the contract price will not give the owner essentially what he contracted for." (*Ibid.*)

Several courts in California have denied contractors the right to recover pursuant to the doctrine of substantial performance where their performance was not found to meet a reasonable standard. (See *Shell v. Schmidt* (1958) 164 Cal.App.2d 350 [330 P.2d 817]; *Williams v. Elliott* (1954) 127 Cal.App.2d 357 [273 P.2d 953]; *Bause v. Anthony Pools, Inc.* (1962) 205 Cal.App.2d 606 [23 Cal.Rptr. 265]; *Tolstoy Constr. Co. v. Minter* (1978) 78 Cal.App.3d 665 [143 Cal.Rptr. 570].)

Here, we find substantial evidence to support the jury's conclusion that MIW completed or substantially completed the contract. Leisner testified that the fabrication and installation was completed in July 2002. Further, MIW completed the minor work that was on the punch list around December 31,

2002. Moreover, Boyce testified that up until February of 2003 he was completely satisfied with the job that MIW had done. According to Boyce, MIW "did beautiful work." The jury could reasonably have concluded that the amount of work that MIW still had to do, the second coat of "Bondo" and caulking, was so trivial or unimportant that MIW could have fixed it very easily.

Relying on *Denver D. Darling, Inc. v. Controlled Environments Construction, Inc.* (2001) 89 Cal.App.4th 1221, 1238 [108 Cal.Rptr.2d 213] (*Denver D. Darling*),[10] and Leisner's testimony that MIW found a small problem with the "Bondo" and caulking that needed to be fixed and that he instructed his crew not to fix it, Boyce argues that the project was never completed and MIW willfully departed from the terms of the contract. To put it another way Boyce argues MIW cannot rely on the doctrine of substantial performance because "it does not apply when a contractor willfully departs from the terms of the contract; that is when a contractor makes a calculated decision not to finish a job."

What Boyce fails to realize is that the evidence shows that MIW had substantially completed, if not fully completed the contract before Leisner instructed his crew to not return to the Boyce project. Thus, there was no willful departure from the terms of the contract. Leisner testified that the "Bondo" and caulking was installed on the exterior ironwork. Having substantially, if not fully, performed, Boyce does not have the right to insist that MIW should have finished a minor repair to the "Bondo" and caulking before his obligation to pay the July 16, 2002 invoice arose.

In conclusion, we find that there was substantial evidence to support MIW's breach of contract claim. Accordingly, the trial court did not err in denying Boyce's nonsuit motion or his JNOV/new trial motion.

*Civil Code Section 3260.1*

Civil Code section 3260.1, subdivision (b) provides: "Except as otherwise agreed in writing, the owner shall pay to the contractor, within 30 days following receipt of a demand for payment in accordance with the contract, any progress payment due thereunder as to which there is no good faith dispute between the parties. In the event of a dispute between the owner and the contractor, the owner may withhold from the progress payment an amount not to exceed 150 percent of the disputed amount. If any amount is

---

[10] In a footnote, the *Denver D. Darling* court, quoting 1 Witkin, Summary of California Law, *supra*, Contracts, section 762, page 690, noted that substantial performance is a question of fact, but it is essential that there be no willful departure from the terms of the contract.

wrongfully withheld in violation of this subdivision, the contractor shall be entitled to the penalty specified in subdivision (g) of Section 3260."

In turn, Civil Code section 3260 provides that "[i]n the event that retention payments are not made within the time periods required by this section, the owner or original contractor withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to his or her attorney's fees and costs." (Civ. Code, § 3260, subd. (g).)

Boyce argues that Civil Code section 3260.1 only applies to contracts involving progress payments. The payment that was alleged to have been withheld was a portion of the final payment, which by the terms of the agreement, was not due until the project was completed. Since the payment was not due until the project was completed, it is considered a final payment and not a progress payment.

Boyce urges that this court should look to the well-settled principles of statutory construction and give significance to every word in the statute, including the word "progress." Boyce asserts that under this well-settled principle "it is presumed that the word 'progress' was included to perform some useful office—in this case, to limit the application of the statute to progress payments only." We do not disagree.

When construing a statute, "we look first to the words of the statute, giving them their ordinary meaning and construing them in context. If the language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citations.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1009 [44 Cal.Rptr.3d 632, 136 P.3d 168].) Here, the plain meaning of the statute is that it applies only to progress payments.

Boyce argues that the term "progress payment" has a particular meaning. Specifically, it is a technical phrase used in the construction industry to mean a payment that the terms of the contract require to be made "before the project is completed." Boyce does not cite to any authority for this proposition. Rather, Boyce asserts that this is the meaning that is used in courts when called upon to interpret a construction contract that calls for payment by means of "progress payments." He cites to two cases, *Pacific Employers Ins. Co. v. State of California* (1970) 3 Cal.3d 573 [91 Cal.Rptr. 273, 477 P.2d 129] and *Tesco Controls Inc. v. Monterey Mechanical Co.* (2004) 124 Cal.App.4th 780 [21 Cal.Rptr.3d 751], for the proposition that a progress payment is a payment that the terms of the contract require to be made before the project is completed.

In *Pacific Employers Ins. Co. v. State of California, supra,* 3 Cal.3d 573, the plaintiff, an insurance company, sought money from the state for money the plaintiff paid out on a labor and material bond furnished on a public works contract.[11] The complaint failed to recite that statutory stop notices or verified claims were filed. The trial court sustained a general demurrer to the plaintiff's complaint with leave to amend. The plaintiff declined to amend, and appealed from the judgment of dismissal that ensued. (*Id.* at p. 575.)

In explaining the plaintiff's theory of recovery, the Supreme Court noted the following: "Plaintiff's theory of recovery is that the agreement called for a lump sum payment of the entire contract upon completion of the work; that progress payments were unauthorized and constituted an alteration of agreement which to the extent of such payments released plaintiff from its obligation as a surety; that principles of subrogation entitle plaintiff to recover to the same extent on account of the payments made by it to the laborers and materialmen under its labor and material bond." (*Pacific Employers Ins. Co. v. State of California, supra,* 3 Cal.3d at p. 575.)

In *Tesco Controls Inc. v. Monterey Mechanical Co., supra,* 124 Cal.App.4th 780, the plaintiff sought to recover money owed it on a contract under which it supplied electrical equipment for a public works project. The defendants claimed the plaintiff was barred from recovering because the plaintiff had waived its mechanic's lien rights up through a date when the funds should have been paid. The trial court granted summary adjudication for the defendants on the plaintiff's first six causes of action determining that the plaintiff's conditional waiver and release of its mechanic's lien rights under Civil Code section 3262, subdivision (d)(1), released lien rights only to the extent the plaintiff had received payment and not up through the date stated on the release. (124 Cal.App.4th at pp. 784, 788.)

In reciting the facts of the case, the court in *Tesco Controls Inc. v. Monterey Mechanical Co., supra,* 124 Cal.App.4th at page 784, noted that the agreement between two of the defendants in the case, the City of Chico (the City)

---

[11] The defendant, the State of California, entered into a written agreement with an individual by the name of Stone. Stone undertook to erect and complete a fire control station, including the furnishing of all of the necessary labor, materials and equipment required for the project. Coincident with the agreement between the defendant and the contractor, the plaintiff executed and delivered to the defendant a "Performance Bond" and a "Labor and Material Bond to Accompany Contract." On or before November 29, 1966, the contractor defaulted and abandoned his contract, leaving numerous laborers and materialmen unpaid. The plaintiff, as surety, paid off a total of $12,801.61 to laborers and materialmen who had provided work or furnished materials prior to the contractor's abandonment. In addition, prior to the abandonment the defendant had paid the contractor progress payments totaling $11,647.03, " 'without the knowledge or consent of plaintiff.' " (*Pacific Employers Ins. Co. v. State of California, supra,* 3 Cal.3d at p. 575.)

and Monterey Mechanical Company, Inc., to expand the City's wastewater treatment control plant at a cost of approximately $29 million, called for "the City to pay Monterey by means of progress payments and a final payment."

■ *Pacific Employers Ins. Co. v. State of California, supra,* 3 Cal.3d 573, is a case involving a subrogation claim where no payment was due from the state. *Tesco Controls Inc. v. Monterey Mechanical Co., supra,* 124 Cal.App.4th 780, is a case involving a statutory lien release document that conditionally waived lien, bond and stop notice claims through the date of the waiver document. Neither case considered the issue before this court. As our Supreme Court has instructed, " 'cases are not authority for propositions not considered.' [Citation.]" *(People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 198 [96 Cal.Rptr.2d 463, 999 P.2d 686].)

■ "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." *(Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

In Webster's Third New International Dictionary (1993) at page 1813, "progress" is defined as "4a: the action or process of advancing or improving by marked stages or degrees."

As Boyce concedes, there is no definition of "progress payment" in the Civil Code. However, Military and Veterans Code sections 270.03, 985 and 987.53 provide that a progress payment is payment for improvements to real property as the work progresses. Certainly, the completion of a project is progress. On the other hand, Business and Professions Code section 7159 defines progress payments to be "any payments, other than the down payment . . . made before the project is completed." Conversely, sections 10853(e)(1) and 20104.50 of the Public Contract Code, define progress payments as "all payments due contractors, except that portion of the final payment designated by the contract as retention earnings." If only a portion of the final payment is exempted from the progress payment designation,

necessarily, the other portion is not. Thus, this implies that part of a final payment is a progress payment.

We find some support for the proposition that a final payment is a progress payment. " 'Progress' payments . . . are payments of portions of the contract price based upon the progress of the contract work. The more usual types of such progress payment provisions are (a) those providing for payments in amounts to be determined by periodic estimates, computations, or reports of the amount of work accomplished; and (b) those providing for payments of specified amounts to be made as particular stages of the work are attained *or completed.*" (Annot., Building Contract—Entire or Divisible (1952) 22 A.L.R.2d 1343, 1344, italics added.) Here, the contract specified for a payment on completion of the project. Thus, under this definition Boyce's final payment was a progress payment.

Furthermore, as explained in California Construction Contracts and Disputes (Cont.Ed.Bar 3d ed. 2006) section 3.63, page 280, "Construction contracts generally provide for payments to be made in installments, known as 'progress payments.' The owner is unwilling to pay the entire contract price at the beginning of the job without assurance that the contractor will complete the work . . . . Moreover, the contractor is unwilling and usually unable to finance a construction job that may take months or even years to complete. Accordingly, payments from the owner to the contractor are made as the job progresses." Again, under this definition it appears that Boyce's final payment was a progress payment.

We turn to the intent of the Legislature in enacting Civil Code section 3260.1 in an attempt to shed more light on this issue. We find little that is helpful. However, according to Assemblywomen Delaine Eastin, the author of Assembly Bill No. 1608 (1991–1992 Reg. Sess.), which added section 3260.1 to the Civil Code, the bill would "ensure that general contractors, followed by their subcontractors and material suppliers, are paid promptly for work completed on private works of improvement." (Delaine Eastin, letter to Governor Pete Wilson, Oct. 11, 1991.)[12] However, the letter goes on to note that Assembly Bill No. 1608 "applies only to construction payments made *during the course of construction.*" (*Ibid.*) This implies that a final payment made after construction is completed would not be included as a progress payment.

Next, we look to the remedy that a contractor has if an owner withholds a progress payment. In *Integrated, Inc. v. Alec Fergusson Electrical Contractor* (1967) 250 Cal.App.2d 287 [58 Cal.Rptr. 503], the court laid out

---

[12] We recognize that technically a letter by the author of a bill to the Governor is not legislative history. We look to this letter for any indication that the construction industry uses the phrase "progress payment" in a particular way.

the rules as to when a contractor can or cannot cease to perform upon failure of an owner to make progress payments. Specifically, the court noted the following: "The proposition that in building contracts failure to make progress payment is not such a breach as will authorize a contractor to abandon the work and sue for damages, but that it does constitute such a breach as will justify rescission and recovery of the reasonable value of labor and materials furnished, was first announced in this state in *Cox* v. *McLaughlin*, 52 Cal. 590; 54 Cal. 605; 63 Cal. 196; 76 Cal. 60 [18 P. 100], and has thereafter been repeatedly stated to be the settled law of this state. (*American-Hawaiian Eng. etc. Co.* v. *Butler*, 165 Cal. 497, 516 [133 P. 280]; *San Francisco Bridge Co.* v. *Dumbarton Land & Improv. Co.*, 119 Cal. 272 [51 P. 335]; *Fairchild etc. Co.* v. *Southern etc. Co.*, 158 Cal. 264, 273–274 [110 P. 951]; *Porter* v. *Arrowhead Reservoir Co.*, 100 Cal. 500, 502 [35 P. 146]; *Golden Gate Lbr. Co.* v. *Sahrbacher*, 105 Cal. 114 [38 P. 635]; *Barris* v. *Atlas Rock Co.*, 118 Cal.App. 606 [5 P.2d 670]; *Monson* v. *Fischer*, 118 Cal.App. 503 [5 P.2d 628]. See *Big Boy D. Corp., Ltd.* v. *Etheridge*, 44 Cal.App.2d 114, 119 [111 P.2d 953]; *Smoll* v. *Webb*, 55 Cal.App.2d 456, 458 [130 P.2d 773].) It has been observed that the proposition as stated leads to the anomalous situation that failure to make progress payments is deemed to be of sufficient materiality to justify abandonment or rescission and recovery on *quantum meruit*, but not such a total breach as would entitle the contractor to sue for damages. (*Big Boy D. Corp., Ltd.* v. *Big Boy D. Corp., Ltd.* v. *Etheridge, supra*, at page 120.)" (*Id.* at p. 296.)

"The mechanical application of the rule as phrased in the cases heretofore cited would lead one to the conclusion that any failure to make progress payments would entitle the contractor to rescind. A careful examination of the facts in those cases in which the rule has been applied reveals, however, that the failures to make progress payments which were held to justify rescission involved either an extended and unreasonable delay, imposition of new and onerous conditions to payment, outright refusal, or a total repudiation of the contract. They did not involve a minor deviation from the covenant." (*Integrated, Inc.* v. *Alec Fergusson Electrical Contractor, supra*, 250 Cal.App.2d at p. 297.)

The logical conclusion to be drawn from this rule is that a payment made after construction is completed is not a progress payment because a contractor no longer has the remedy of stopping work and rescinding the contract. Simply put, the contractor has upheld his side of the bargain and the construction is completed. Thus, there is nothing left on which to stop work.

Moreover, in Civil Code section 3260.2 the Legislature has provided a stop work remedy for contractors in the event of nonpayment by an owner. Specifically, Civil Code section 3260.2 provides in part: "If an original

contractor is not paid all moneys which are owed pursuant to a written contract for a private work of improvement within 35 days from the date payment is due pursuant to the written contract, and there is no dispute as to the satisfactory performance of that original contractor, the original contractor shall have a right to serve upon the owner a '10-day stop work order' that states that unless all amounts then due the original contractor are paid within 10 days from the date notice is provided under this section, the original contractor will stop work on the project."

Again, it makes no sense to say that a final payment due upon satisfactory completion of a project is a progress payment because a contractor cannot stop work on something that is already finished.

■ In conclusion, we hold that the term "progress payment" has a particular meaning in the construction industry. As enacted in Civil Code section 3260.1 a progress payment is a payment other than a down payment that is to be made before the project is completed.[13] Accordingly, because the agreement between Boyce and MIW called for a payment of the net due under the contract upon satisfactory completion of the project there was no evidence that Boyce wrongfully withheld a progress payment. Therefore, the trial court erred in instructing the jury regarding the 2 percent penalty pursuant to Civil Code section 3260.1.

Moreover, since Civil Code section 3260.1 does not apply to this case, the court erred in awarding attorney fees under that section.[14]

---

[13] As is explained in California Construction Law, "The basic owner-contractor agreement will probably refer to some provision in the general or supplementary conditions containing more detail regarding payment, but it is also common practice for the basic agreement to include a statement of the requirements the contractor must meet in applying for progress payments. A reasonable time should be allowed for the owner to review the contractor's progress payment request and issue checks. [¶] Most construction agreements contain a provision for retention, which is a percentage (usually 10 percent) of the amounts due the contractor but held by the owner as a type of security for the contractor's full and complete performance and to satisfy potential lien claims at the end of the project. [¶] Final payment is made at the end of the project when the work had been fully performed and consists of the entire unpaid balance of the contract amount, including the retention. In fact, the release of the retention usually constitutes most of or all of the final payment." (Gibbs & Hunt, Cal. Construction Law (16th ed. 2000) § 3.02[A][5], p. 103.) There can be little doubt that the construction industry makes a distinction between progress payments and final payments.

[14] By this we do not express a view that Civil Code section 3260.1 supports an award of attorney fees even in a dispute over a contractually agreed progress payment. (See *Denver D. Darling, supra,* 89 Cal.App.4th at p. 1241 [implicitly distinguishing between the Civ. Code, § 3260 2 percent "penalty" provision and the attorney fees provision of subd. (g)].)

*Disposition*

The award of penalties and attorney fees under Civil Code section 3260.1 is reversed. In all other respects, the judgment is affirmed. The matter is remanded to the trial court to enter a new judgment that does not include an award of such penalties and attorney fees. Each party is to bear its own costs on appeal.

Rushing, P. J., and Premo, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 16, 2008, S161010. George, C. J., did not participate therein.