Filed 2/13/26  Queens Land Builder v. Cal Garden CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| QUEENS LAND BUILDER, INC., | B330797 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20GDCV00072) |
| v. | |
| CAL GARDEN, LLC et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge.  Affirmed.

Zarmi Law and David Zarmi for Defendants and Appellants.

Law Office of Steven P. Scandura, Steven P. Scandura; and Howard C. Posner for Plaintiff and Respondent.

———————————————

# INTRODUCTION

Cal Garden, LLC and Ming Gu (together, Cal Garden) appeal from a $1,678,371.79 judgment in favor of Queens Land Builder, Inc. In 2016, Cal Garden contracted with Queens Land to build a 20-unit condominium complex in the City of Arcadia. The project was completed in 2019, after substantial delays. The parties sued one another, primarily alleging breach of contract claims. After a bench trial, the court found in favor of Queens Land. On appeal, Cal Garden characterizes the trial court's findings as legal in nature and based on undisputed evidence. But Cal Garden essentially challenges the trial court's factual findings and invites us to reweigh the evidence. On appeal, we do not reweigh the evidence or make credibility determinations. Accordingly, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Contracts*

Gu is the majority shareholder of Cal Garden. Cal Garden purchased a lot in the City of Arcadia, which abutted two neighboring properties with concrete block walls on both sides. Queens Land is a construction company owned by Tie Gao.

On February 26, 2016, Cal Garden hired Queens Land to build 20 condominiums with subterranean parking for $5.75 million (February 26 contract). The February 26 contract specified Queens Land was responsible for the "[m]ain structure, all water, electricity, gas, heat and landscaping facilities" and that it "will be responsible for [these items] till they are fit for move-in." Queens Land promised to deliver the completed

2

property by May 1, 2017, which is 420 calendar days from the March 1, 2016 start date.  The contract provided for a $1,000 bonus "for each day that the project is completed ahead of schedule" and a penalty of $1,000 for each day the project was delayed.  The February 26 contract was written in both English and Mandarin because Gu's primary language is Mandarin.  Cal Garden provided the architectural plans, the engineering plans, and the building plans to Queens Land.  Gao testified Queens Land had no input on the plans.

On March 31, 2016, the parties signed another contract that specified a price of $6.9 million for the project (March 31 contract).  Unlike the February 26 contract, this contract was not translated into Mandarin.  Gao testified at trial that the March 31 contract provided for higher quality finishing work, and that the initial February 26 contract included "very simple, very common" finishes.

Gu testified the parties generated the March 31 contract "for the purpose of getting a bigger line of credit with the bank."  Gu stated the parties intended the loan to be divided into a $5.75 million portion to pay Queens Land and the remaining $1.15 million would be split between Cal Garden and Queens Land to pay for expenses such as city fees, design fees, and staff expenses.  The financing company approved the loan and paid out funds based upon Queens Land's periodic requests and Cal Garden's approval.

The parties subsequently agreed to change the construction start date from March 1, 2016, to April 5, 2016, but retained the construction period of 420 days.  Thus, the parties intended construction to finish in 2017.  Shortly after construction began, Queens Land discovered the soils engineering report provided to

3

it by Cal Garden, which stated there was "no caving" of the soil upon excavation, was incorrect. Gao testified the soil at the lot was commonly known as "sugar sand" because it would flow back into any hole that was drilled.[1] The condition of the soil required a different type of shoring system. The parties were therefore required to revise the engineering plans, resubmit the plans to the city for approval, and hire a different drilling company.

The new engineering plan required I-beams to be pounded into the ground rather than inserted into a hole that had been dug. The pounding of the I-beams caused vibrations to spread to the neighboring properties, resulting in their concrete block walls sinking and other property damage. The neighbors complained to the city and sued. The project was delayed while the parties attempted to fix the problem.

In June 2017, the parties signed a third contract entitled "Supplemental Contract on Construction of Cal Garden" (supplemental contract) with a $6.1 million contract price "[i]n consideration of the serious delay of the construction progress and over budget of the construction cost[s] . . . ." Under the supplemental contract, the parties agreed "to have the completion date specified under the original contract extended to October 31st, 2017, and [Cal Garden] will not claim the daily penalty fee of USD one thousand for the period from June 30, 2017 through October 31st, 2017 if [Queens Land] completes and turns over all items in this project before October 31st, 2017. In

---

[1] Cal Gardens obtained a later soils report dated February 29, 2016, that indicated "boring found caving at 4 to 10 feet." Gao testified he did not receive the new report prior to construction and was not told about the caving prior to excavation.

4

the meantime, [Cal Garden] agrees to raise construction cost from USD 5.75 million which is specified under the original contract to USD 6.1 million (which will include the additional cost of materials and labor for the work on drift sand in basements submitted by [Queens Land])." The supplemental contract also provided for a $100,000 bonus to Queens Land if it completed the project before October 31, 2017. The supplemental contract specified that the terms of the February 26 contract remained in effect and that the supplemental contract overrode the February 26 contract to the extent there were any inconsistencies between the two. Gao testified the supplemental contract also provided that Cal Garden would be responsible for paying any higher costs for certain materials, such as tile, wood flooring, carpet, bathtubs, exterior walls, painting, and railing, if these costs exceeded the budget under the February 26 contract.

The funds from the financing company ran out in November 2017, and the subcontractors stopped work because they were not paid. Gao and his wife made personal loans to Gu to ensure the subcontractors were paid and the project completed. Cal Garden does not dispute these loans were unpaid and their amounts. In 2018, the city "red tagged" the project twice and lifted the stop work order on July 17, 2018. Cal Garden hired Kevin Chang in May 2019 to oversee construction.

A certificate of occupancy was issued by the city in September 2019. Cal Garden sold three units but was prevented from selling any others because Queens Land recorded a lien on the property, which forced Cal Garden to rent out the remaining units.

B.   *The Litigation Proceedings*

On January 17, 2020, Queens Land sued Cal Garden for breach of contract, enforcement of the mechanics lien, an accounting, and intentional interference with contractual relations.  Queens Land alleged the March 31 contract for $6.9 million was the operative contract between the parties.  Queens Land further alleged Cal Garden paid $4.3 million of that amount, leaving a balance of more than $2.5 million plus other charges for change orders, soft costs, engineering, and "other incidental charges."  Queens Land asserted it completed its final work on the project on August 30, 2019, and delivered the project to Cal Garden under the March 31 contract.

Cal Garden filed a cross-complaint against Queens Land, Gao, his wife, and the qualifying license holders for Queens Land, alleging claims for breach of contract, misappropriation of construction funds, and quiet title.  Cal Garden set out the circumstances leading to the three contracts between the parties, as set out above.  Cal Garden alleged the parties intended the February 26 contract and the supplemental contract to be the binding contracts.  Cal Garden explained the supplemental contract incorporated the terms of the February 26 contract but allowed for a $100,000 bonus to Queens Land if it completed the project by October 31, 2017, and called for liquidated damages of $1,000 per day if the project was not completed by that date.  Cal Garden further alleged it paid over $1 million to various contractors, subcontractors, engineers, and others to get the project to completion.  Cal Garden claimed it was entitled to reimbursement of "at least $600,000" for the amount it overpaid Queens Land to complete the project.  Cal Garden additionally

6

alleged a Queens Land representative signed an unconditional waiver and release on May 20, 2019, confirming the completion of the project and full payment by Cal Garden.

The trial court conducted a six-day bench trial in early 2023. It issued a final statement of decision on April 18, 2023. The court found Queens Land proved its breach of contract claim, but that the operative contract was not the March 31 contract advanced by Queens Land because the parties did not intend the March 31 contract to be binding between them.[2] It instead found that the February 26 contract and the supplemental contract were valid and binding on the parties. The court further found the supplemental contract provided for a $350,000 incentive to the original price of $5.75 million, added a $100,000 bonus if Queens Land completed the project by October 31, 2017, and imposed a $1,000 liquidated damages penalty for each delayed day beyond October 31, 2017.

The court stated Cal Garden's recovery under the liquidated damages provision depended on whether Queens Land breached the contract or whether the delay in completing the project was excused. The court found Cal Garden failed to demonstrate Queens Land breached the contract. The multiple delays were attributed to problems with the soils engineering, the depletion of the construction loan, and multiple change orders, none of which were attributable to Queens Land. Queens Land

_____

[2]     The court determined the evidence did not establish the parties "intended to artificially inflate the putative cost of the contract to secure a larger construction loan," but also found Queens Land did not prove the March 31 contract was "a valid, binding agreement."

7

was thus entitled to the February 26 contract price of $5.75 million because it substantially completed the project, but not the $350,000 incentive or the $100,000 bonus under the supplemental contract because it did not complete the project by October 31, 2017.

The court rejected Cal Garden's purported unconditional waiver and release as "not authentic." The court also rejected the parties' remaining arguments regarding offsets or amounts they were owed, stating it based its decisions on the documentary evidence and credibility determinations.

The court entered judgment against Gu and Cal Garden in the amount of $1,678,371.79 in favor of Queens Land. The court found Cal Garden failed to prove any of its causes of action in the cross-complaint. Cal Garden timely appealed.

**DISCUSSION**

A. *Standard of Review*

Cal Garden asserts the trial court abused its discretion when it made unsupported factual findings and that it misinterpreted the parties' contracts. We, however, review a trial court's factual findings for substantial evidence and generally review the interpretation of a contract under a de novo standard.

"When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582; see *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503.) " 'In general, in reviewing a judgment based upon a statement of decision

8

following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94.)

" 'The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.' [Citation.] 'The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' [Citation.] ' "Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." ' " (*In re Marriage of Ciprari, supra,* 32 Cal.App.5th at p. 94.)

By contrast, the abuse of discretion standard measures whether, given the established evidence, the lower court's action " ' " 'falls within the permissible range of options set by the legal criteria.' " ' " (*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 452; *Dorman v. DWLC Corp.* (1995) 35 Cal.App.4th 1808, 1815.) Reviewing courts " 'defer to the trial court's factual findings so long as they are supported by substantial evidence, and

9

determine whether, under those facts, the court abused its discretion. If there is no evidence to support the court's findings, then an abuse of discretion has occurred.' " (*Doe v. Software One, Inc.* (2022) 85 Cal.App.5th 98, 109.)

We review de novo the interpretation of a contract or other written instrument where no conflicting extrinsic evidence was introduced. (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866; see also *In re Martinez* (2012) 210 Cal.App.4th 800, 815.) "To the extent there is conflicting extrinsic evidence requiring credibility determinations by the finder of fact regarding a meaning of which the contract is reasonably susceptible, we will uphold the trial court's determination if supported by substantial evidence." (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531-532.)

B. *Substantial Evidence Supports the Trial Court's Finding that Queens Land Substantially Performed Under the Parties' Operative Contract*

Cal Garden argues Queens Land failed to deliver the "move-in" ready building it promised in the February 26 contract. According to Cal Garden, a certificate of occupancy was issued only after it was forced to hire Chang in May 2019 to oversee completion of the project. Cal Garden alternatively argues the trial court should have allowed it to recoup its costs to mitigate its damages and for defects in the construction even if Queens Land substantially performed on the project.

1. *Governing Law*

The California Supreme Court set out the doctrine of substantial performance in a construction case in *Thomas*

10

*Haverty Co. v. Jones* (1921) 185 Cal. 285, 289 (*Thomas Haverty*). There, the high court held that a contractor's substantial performance entitles him to recover the amount of the contract price less the amount allowed as damages for his failure to strictly comply with the contract specifications. (*Ibid.*) *Thomas Haverty* explained, "there is a substantial performance where the variance from the specifications of the contract does not impair the building or structure as a whole, and where after it is erected the building is actually used for the intended purpose, or where the defects can be remedied without great expenditure and without material damage to other parts of the structure, but that the defects must not run through the whole work so that the object of the owner in having the work done in a particular way is not accomplished, or be such that a new contract is not substituted for the original one, nor be so substantial as not to be capable of a remedy and the allowance out of the contract price will not give the owner essentially what he contracted for." (*Id.* at p. 291; see *Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1292 (*Murray's Iron Works*); see also *Lowy v. United Pacific Ins. Co.* (1967) 67 Cal.2d 87, 92-93.) "Several courts in California have denied contractors the right to recover pursuant to the doctrine of substantial performance where their performance was not found to meet a reasonable standard." (*Murray's Iron Works*, at p. 1292.)

2.     *The Trial Court's Substantial Performance Finding Is Supported by Substantial Evidence*

Here, substantial evidence supports the trial court's finding that Queens Land substantially performed on the contract by giving Cal Garden "essentially what [it] contracted for." (*Thomas*

11

*Haverty, supra,* 185 Cal. at p. 291.) Gao testified Queens Land ultimately completed the construction of the units. The court admitted into evidence the approved inspection reports and photographs showing the completed buildings and underground parking. Additionally, Cal Garden recorded a Notice of Completion verifying that "[a] work of improvement on the property hereinafter described was COMPLETED on April 12, 2019" and "[t]he work of improvement completed is described as follows: New Constructions-20 Unit Condominium." Gu testified a certificate of occupancy was issued on September 30, 2019. This is substantial evidence of Queens Land's substantial performance of the parties' construction contract.

Cal Garden does not dispute Queens Land built 20 condominiums and a subterranean garage. It instead argues the project was not "move-in ready" because it was unable to get a certificate of occupancy in May 2019. Cal Garden relies on Chang's testimony that the elevator, sump pump, and garage ventilation were "not done" by then, and there remained "a lot of loose end[s] for [the] interior." It also contends the landscaping was not done. Cal Garden asserts it had to hire Chang in May 2019 to oversee and coordinate the completion of the project over the final few months of construction. It further cites its payment of $1,220,770 to mitigate its damages as evidence of how far from "move-in" condition the project was in May 2019.

Even accepting Cal Garden's assertion that Queens Land stopped work at the site in May 2019 and the property was not in move-in ready condition, as the finder of fact, the trial court nevertheless was entitled to find that Queens Land substantially performed under the parties' contract. The court could reasonably find the amount of work remaining was easily

12

remedied or compensated. "What constitutes substantial performance is a question of fact, but it is essential that there be no wilful departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so that the promisee may get practically what the contract calls for." (*Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 187; see *Murray's Iron Works, supra,* 158 Cal.App.4th at p. 1293 [substantial performance on construction contract was shown where the jury could reasonably have concluded that the amount of work remaining could be easily fixed].)

Cal Garden fails to cite any authority that allows us to ignore the substantial performance doctrine in favor of strict compliance with the move-in ready provision of the contract. Thus, Cal Garden's assertion that Queens Land failed to deliver a move-in ready property, even if true, does not override the substantial evidence that Queens Land built a 20-unit condominium complex and underground parking under the contract.

3. *The Trial Court Properly Found Cal Garden Failed To Prove It Was Entitled to an Offset for Damages It Incurred*

Cal Garden argues in the alternative that, even if the trial court's finding of substantial performance was supported by the evidence, the court should have allowed Cal Garden to recover $1,220,770.26 for costs it paid to correct construction defects and mitigate its damages. Cal Garden argues it paid $1,220,770.26 for subcontractor work and for HVAC units, water heaters, gas meters, and landscaping that should have been borne by Queens Land under the contract. As stated, the doctrine of

13

substantial performance entitles a property owner to recover the amount of the contract price less the amount allowed as damages for the contractor's failure to strictly adhere to the parties' contract.  (See *Thomas Haverty, supra,* 185 Cal. at p. 289.)

According to Cal Garden, the court "gave no reasons why Cal Garden's costs in correcting those defects and mitigating damages generally would not be recoverable."  The statement of decision belies this assertion.  The trial court found Cal Garden "did not prove that the $1,220,770.26 they claimed to have spent to pay subcontractors and for materials and other costs were mitigation of damages for a supposed breach by Queens Land."  The court specifically found the depletion of the construction loan resulted in the failure to pay the subcontractors, but that the construction loan issue was not attributable to Queens Land.

Cal Garden fails to demonstrate the court erred when it found Cal Garden did not prove an offset.  In its appellate briefing, Cal Garden cites, among other evidence, trial exhibit 522 and Gu's testimony regarding the purported defects.  Trial exhibit 522 is a spreadsheet listing the date, the check number, the payee, and the amounts of payments made by Cal Garden to various vendors from 2018 to 2019.  The exhibit also includes copies of checks written by Cal Garden to those vendors.  The spreadsheet has a column labeled "description," but the descriptions are written in Chinese, and there does not appear to be a certified translation in the record.  (See Evid. Code, § 753, subd. (a) ["When the written characters in a writing offered in evidence are incapable of being deciphered or understood directly, a translator who can decipher the characters or understand the language shall be sworn to decipher or translate the writing."]; cf. Cal. Rules of Court, rule 3.1110(g)

14

["Exhibits written in a foreign language must be accompanied by an English translation, certified under oath by a qualified interpreter"].) Cal Garden provides no explanation regarding how to read this spreadsheet or why these payments are recoverable as damages for Queens Land's purported deficient performance under the parties' contract.

Additionally, Gu's testimony does not support Cal Garden's argument that the entire amount it paid was recoverable. At trial, Gu gave a "rough estimat[e]" that $200,000 to $300,000 of Cal Garden's payments were made to correct construction defects. As set out below, Cal Garden expressly waived and released Queens Land from "any and all negligence and construction defect claims" and agreed that Cal Garden "will be precluded from asserting same, or any payment made pursuant to this Agreement, as a setoff or defense . . . ."

C.    *Substantial Evidence Supports the Trial Court's Finding that Cal Garden Breached the Contract*

Next, Cal Garden argues the trial court erred when it found Queens Land proved its breach of contract claim against Cal Garden because the evidence showed that Cal Garden paid more than it owed on the contract. According to Cal Garden, Queens Land's own calculations established Cal Garden paid $5,786,728 to it on a contract valued at $5,750,000. Cal Garden fails to explain how or why the extra $36,728 it paid to Queens Land proves it did not breach the operative contracts. Cal Garden provides no legal authority or evidentiary support for the proposition that it only had to pay $5,750,000 and nothing more. Indeed, both the February 26 contract and the supplemental contract contemplated Cal Garden would pay

15

Queens Land additional monies for change orders, upgrades, and other expenses. Cal Garden has failed to meet its burden to demonstrate error on appeal. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.)

D.     *Substantial Evidence Supports the Trial Court's Change Order Findings*

Cal Garden also challenges the trial court's finding that change order nos. 4 (handicap railing), 8 (stucco), and 10 (patio roof) were valid and payable. In making its findings regarding the 26 change orders submitted by Queens Land, the trial court "reviewed the evidence concerning each change order and made credibility determinations concerning the relevant testimony; the Court [did] not fully adopt either side's arguments concerning how each one should be categorized." The court then determined that 11 change orders were valid and payable by Cal Garden. Although Cal Garden argues we should review these determinations de novo as matters of contract interpretation, in essence, Cal Garden challenges the court's factual findings, and substantial evidence supports the court's findings.

1.     *Change Order No. 4*

At trial, Gao testified Queens Land submitted change order no. 4 because the city required installation of a railing on a handicap ramp to comply with the Americans with Disabilities Act (ADA). Gao explained Cal Garden provided all the architectural, building, and engineering plans necessary for the construction of the project without any input from Queens Land. Gao stated the plan design for the railing was inconsistent with

16

the city's requirements.  Gao denied he was "responsible for engineering mistakes or mistakes made by architects."

Trial exhibit 26, which set out all the change orders for which Queens Land sought to recover, explained that change order no. 4 represented an additional $20,503.03 cost for "[l]abor charges for extra front yard concrete work, side gate, and extra driveway concrete work.  This was extra work not addressed in the plans or within the $25,000 construction budget."  The supplemental contract specified that labor charges for "railings" must be approved by Cal Garden and that any costs exceeding the original budget were to be borne by Cal Garden.  Substantial evidence supports the trial court's finding that change order no. 4 was valid and payable.

Cal Garden attempts to overcome this substantial evidence by arguing that the court should have accepted its version of conflicting facts.  It contends the plans for the project required that "[a]ll work shall conform to all applicable federal, state and local codes and ordinances.  Nothing shown in these drawings shall be constructed [*sic*] as permission to violate any [of the] above codes."  Cal Garden argues Gao's review of these plans before bidding on the contract, plus the language found in these plans, meant that the parties agreed Queens Land would be responsible for building the railing in conformance with the ADA without regard to whether the plans conformed to ADA requirements.  Cal Garden provides no legal or factual basis for the proposition that Queens Land was responsible for correcting any defects or mistakes in the plans provided to it by Cal Garden. The trial court was entitled to reject Cal Garden's theory of liability.  (See *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1028-

17

1029 (*Gomez*) [the trial court is entitled to resolve factual conflicts in the evidence].)

### 2.    *Change Order No. 8*

Substantial evidence also supports the trial court's finding that change order no. 8 was valid and payable.  At trial, Queens Land presented evidence that change order no. 8 arose from Cal Garden's request in 2018 to upgrade the stucco on the buildings.  The February 26 contract specified, "Plaster/Stucco (LA HABRA or Santa Barbara)."  Gao testified La Habra and Santa Barbara are companies that manufacture stucco.  He explained the original contract provided for the cheapest stucco finish, which was sprayed on, and that a smooth finish required more labor and took more time.  As a result, the new stucco required the scaffolding to remain up for a longer time.

Cal Garden disputed Gao's testimony.  It argued it contracted for a smooth finish, relying on its construction expert's testimony that La Habra is a manufacturer that has a smooth finish named Santa Barbara.  The trial court was entitled to make a credibility determination regarding the conflicting testimony between Gao and Cal Garden's expert.  Whether the parties intended for a smooth or rough finish in their initial contract was a factual finding properly decided by the trial court. (See *Gomez, supra,* 54 Cal.App.5th at pp. 1028-1029.)

### 3.    *Change Order No. 10*

Substantial evidence also supports the trial court's finding that change order no. 10 was valid and payable.  Gao testified at trial that change order no. 10 arose from Cal Garden's request for an upgrade to the patio roof design by adding "rough carpentry"

18

and "plastering stucco."  Cal Garden argues that Gao later testified:  "at the time when the exterior wall stucco was discussed the portion below the patio roof was open we used the wrong cabinetry work and we fill in that area and afterwards we used the same stucco for that area as the ones on the exterior wall and those stucco were finished on the same level or same quality."

Cal Garden focuses on the word "wrong" to argue that Gao admitted he made a mistake that needed to be corrected.  In Cal Garden's view, any cost to correct the "wrong cabinetry work" should be allocated to Queens Land.  Gao's testimony on this point was vague and ambiguous, and as the fact finder the trial court was entitled to interpret it as supporting his prior testimony that change order no. 10 was an upgrade to the patio roof.  "It is for the trier of fact to consider internal inconsistencies in testimony, to resolve them if this is possible, and to determine what weight should be given to such testimony."  (*Clemmer v. Hartford Ins. Co.* (1978) 22 Cal.3d 865, 878, overruled on another ground by *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 135; see *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 595-596 ["It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact"].)

E.      *Cal Garden Fails To Demonstrate the Trial Court Erred by Failing To Credit It $132,295*

Cal Garden argues this court should modify the judgment so it is credited for $132,295 that Queens Land purportedly "admitted Cal Garden had spent on parts of the project that were [Queens Land's] obligation under the contract."  Cal Garden asserts the trial court miscalculated and failed to credit

19

Cal Garden for certain amounts it paid for "the basic stucco ($13,000), fire sprinkler ($81,865), and HVAC ($37,430) [that] should have been included" in the contract. In support of its claim that Queens Land "admitted" it was obligated to provide these items under the contract, Cal Garden cites the parties' contracts, trial exhibit no. 26 (a spreadsheet that sets out Queens Land's damages), trial exhibit no. 10 (a disbursement request to the financing company), and trial exhibit no. 11 (a spreadsheet that shows disbursements from the financing company). These documents are not admissions of liability by Queens Land. Nor do they demonstrate on their face, in the absence of any explanation of their contents, Queens Land's liability. Indeed, Cal Garden does not provide any reasoned argument why or how it was entitled to a credit, or why the stucco, fire sprinkler and HVAC costs noted above were costs that fell under the parties' contract. Accordingly, "[w]e may [and do] disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 ["We are not bound to develop appellants' arguments for them"].)

F.     *Cal Garden Fails To Demonstrate the Trial Court Erred by Not Crediting a $50,000 Loan It Made to Queens Land*

Cal Garden next argues this court should modify the judgment so it is credited $50,000 for a loan it made to Queens Land. Queens Land does not dispute Cal Garden loaned it $50,000, but asserts the parties agreed the $50,000 would be

20

used by Queens Land to pay expenses that were Cal Garden's responsibility under the contract. Gao testified at trial that "there were other expenses that occurred for the project, which [were] supposed to be paid by the developer, but we ended up paying—paid for it, so the developer told us that we could use those remaining money, the 50,000, to pay those expenses." Cal Garden does not dispute the parties agreed to this allocation of the $50,000 loan. It instead argues that the $50,000 loan "should either be an offset or a recognition that [Cal Garden] paid over the $5,750,000 contract price and no breach occurred on their part." The trial court was entitled to credit Gao's testimony and decline to offset the damages amount, and Cal Garden has not demonstrated any persuasive reason why we should modify the judgment. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008; *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968 ["we defer to the trier of fact on issues of credibility"].)

G.     *Cal Garden Fails To Demonstrate the Trial Court Erred When It Awarded Queens Land $64,112 in Engineering Costs*

Cal Garden argues the trial court erred when it awarded $64,112 in "excluded engineering costs," and that this court should modify the judgment because the parties agreed to release one another from claims for engineering costs associated with the neighboring properties' subsidence problems. The record belies this argument.

As stated, during construction the neighbors' walls began to sink, and other damage occurred as a result of the pounding of the I-beams into the ground for the underground parking structure. The neighboring homeowners' associations sued

21

Cal Garden, Queens Land, and certain subcontractors. In 2022, Cal Garden and Queens Land, among others, settled with the homeowners' associations. Under the settlement agreement, Cal Garden paid $500,000, and Queens Land (through its insurer) paid $675,000 to the homeowners' associations.

The settlement agreement also specified that there existed additional lawsuits between Cal Garden and Queens Land, i.e., this case, deemed the "mechanic's lien action"; Cal Garden's cross-complaint in this action, deemed the "contract dispute action"; and a construction defect action filed by Cal Garden against Queens Land and its subcontractors under Los Angeles County Superior Court Case No. 20STCV16589. Although Cal Garden released Queens Land from certain construction defect claims as part of the parties' settlement with the neighboring homeowners' associations, Queens Land expressly retained "all of their claims asserted in the Mechanic's Lien Action." Under these facts, the trial court properly found Cal Garden is liable for $64,112 in excluded engineering costs because Queens Land did not release these claims in the settlement of the homeowners' association cases. (See *Regalado v. Callaghan, supra,* 3 Cal.App.5th at pp. 595-596.)

## DISPOSITION

The judgment is affirmed.  Queens Land may recover its costs on appeal.


                                        MARTINEZ, P. J.

We concur:


    STONE, J.                          GIZA, J.*

---

\*     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.